VORA LAW FIRM, P.C.
Nilay U. Vora (Cal. Bar No. 268339)
nvora@voralaw.com
Jeffrey A. Atteberry (Cal. Bar No. 266728)
jatteberry@voralaw.com
201 Santa Monica Blvd, Ste 300,
Santa Monica, CA 90401-2224
Tel.: (424) 258-5190

*Attorneys for Plaintiff*
*Cedars-Sinai Medical Center*
*as to Defendant AIG Specialty Insurance*
*Company*

LATHAM & WATKINS LLP
Kirsten C. Jackson (Cal. Bar No. 265952)
kirsten.jackson@lw.com
10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Tel.: (424) 653-5500

*Attorneys for Plaintiff*
*Cedars-Sinai Medical Center*
*as to Defendant Ironshore Specialty*
*Insurance Company*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CEDARS-SINAI MEDICAL CENTER, a California nonprofit public benefit corporation,<br><br>Plaintiff,<br><br>v.<br><br>AIG SPECIALTY INSURANCE COMPANY, an Illinois corporation, and IRONSHORE SPECIALTY INSURANCE COMPANY, an Arizona corporation,<br><br>Defendants. | CASE NO. 2:24-cv-02543-MCS-RAO<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) DECLARATORY RELIEF;**<br><br>**(2) BREACH OF CONTRACT; AND**<br><br>**(3) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>*Honorable Mark C. Scarsi*<br>Courtroom: 7C<br><br>Trial Date: June 24, 2025<br>Action Filed: February 9, 2024<br>Removed: March 28, 2024 |

1

AMENDED COMPLAINT FOR DECLARATORY RELIEF, BREACH OF CONTRACT, AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Defendants AIG Specialty Insurance Company ("AIG") and Ironshore Specialty Insurance Company ("Ironshore") (together, "Defendants") issued specialized insurance coverage to Plaintiff Cedars-Sinai Medical Center ("Cedars-Sinai") that was expressly designed to protect hospitals from cleanup and business interruption losses incurred due to the presence of a virus. Notably, this coverage would be triggered without any requirement that the policyholder establish physical loss or damage. Nevertheless, when Cedars-Sinai sought coverage for exactly such losses caused by the presence of the SARS-CoV-2 virus during the pandemic, AIG denied coverage. Ironshore, whose policy follows form to AIG's policy, did not provide a coverage position to Cedars, but opted instead to take a "wait-and-see" approach as Cedars-Sinai's losses mounted. Accordingly, Cedars-Sinai is compelled to bring this action for breach of contract and bad faith insurance practices against Defendants.

## I.    **THE PARTIES**

1.    Plaintiff Cedars-Sinai is a California nonprofit corporation with its principal place of business in Los Angeles, California. Cedars-Sinai is one of the largest nonprofit academic medical centers in the United States, with a Level 1 trauma center and 886 licensed beds, 2,100 physicians, 2,800 nurses, and thousands of other healthcare professionals and staff. Because it is one of Southern California's largest acute care hospitals, Los Angeles County emergency management officials turned to Cedars-Sinai to shoulder the brunt of coronavirus cases, both in terms of patient numbers and severity of cases. Indeed, during the first year of the pandemic alone, Cedars-Sinai Medical Center and its affiliate, Cedars-Sinai Marina del Rey Hospital, treated thousands of confirmed COVID-19 patients.

2.    Defendant AIG is an Illinois corporation with its principal place of business in New York, New York. AIG is a commercial insurance company licensed to do business in California and, at all times relevant to this Complaint,

sold insurance policies in California and was otherwise doing business in California.

3.    Defendant Ironshore is an Arizona corporation with its principal place of business in Boston, Massachusetts.    Ironshore is a commercial insurance company licensed to do business in California and, at all times relevant to this Complaint, sold insurance policies in California and was otherwise doing business in California.

## II.    JURISDICTION AND VENUE

4.    Jurisdiction is proper in this Court because it has general subject matter jurisdiction and no statutory exceptions to jurisdiction exist.

5.    This Court has personal jurisdiction over AIG because AIG regularly conducts business in California, including by selling insurance policies to policyholders in California and by insuring properties in California.  Furthermore, pursuant to the terms of its insurance policy, AIG agreed to "submit to the jurisdiction of a court of competent jurisdiction within the United States."

6.    This Court has personal jurisdiction over Ironshore because Ironshore regularly conducts business in California, including by selling insurance policies to policyholders in California and by insuring properties in California.  Furthermore, pursuant to the terms of its insurance policy, Ironshore agreed to "submit to the jurisdiction of a court of competent jurisdiction within the United States."

7.    Venue is proper in this Court pursuant to California Code of Civil Procedure section 395(a) because Defendants contracted with Cedars-Sinai to perform an obligation in this county and because the contracts at issue were entered into in this county.

8.    Venue is proper in this Court notwithstanding the "Choice of Forum" clause in Ironshore's insurance policy, because the Ironshore Policy contains a competing "Service of Suit" clause that requires Ironshore "to submit to the jurisdiction of a court of competent jurisdiction within the United States."   This

district has held that similarly-worded "Service of Suit" clauses override a "Choice of Forum" clause and allow the insured to bring suit in any U.S. court.

## III.   STATEMENT OF FACTS

## A.   INTRODUCTION

9.     Cedars-Sinai seeks coverage under AIG Commercial Pollution Legal Liability Policy No. PLC 18946438 (the "Primary Policy") and Ironshore Environmental Excess Liability Policy No. 002400100 (the "Excess Policy," and together with the Primary Policy, the "Policies") for millions of dollars in cleanup costs and business interruption losses directly resulting from the spread of the coronavirus throughout its insured properties.  The Policies expressly cover losses caused by "the discharge, dispersal, release or escape of viruses."

10.     Cedars-Sinai's claim for coverage stands in stark contrast to the vast majority of cases brought nationwide by policyholders seeking coverage in connection with the virus.  Nearly all of those cases were brought under standard property insurance policies that (a) required "direct physical loss or damage" to property, and (b) often contained "absolute virus exclusions" barring coverage for losses caused by viruses.   By contrast, the Primary Policy that Cedars-Sinai purchased from AIG (a) does ***not*** require a showing of direct physical loss or damage to property and (b) expressly ***provides coverage for losses caused by viruses***.

11.     The Excess Policy "follows form" to the Primary Policy, meaning that it provides coverage "in accordance with the same terms, conditions, exclusions, limitations and warranties as are contained, as of the inception of this policy period," in the Primary Policy.

12.     Moreover, unlike many policyholders who have sought coverage in connection with the coronavirus but who have failed to demonstrate that the virus was actually present on their property, Cedars-Sinai has thousands of confirmed positive COVID-19 tests from patients who repeatedly and continuously brought

the coronavirus onto Cedars-Sinai's properties and spread the virus throughout them. Those repeated discharges and dispersals of the virus resulted in substantial cleanup costs and business interruptions—including, but not limited to, closures of entire sections of Cedars-Sinai's facilities and cancellations of thousands of elective surgical procedures. Cedars-Sinai is entitled to reimbursement for these losses under the express terms of the Policies' coverages.

13. After years of unjustified delays, AIG wrongfully denied coverage to Cedars-Sinai based on shifting and sometimes even conflicting positions. For example, AIG denied coverage under the Primary Policy—which provides express coverage for pollution—on the ground that the spread of the coronavirus is not a "Pollution Condition." However, AIG previously took the opposite position and denied coverage for Cedars-Sinai's COVID-related losses **under a separate property policy** based on an express exclusion for pollution. In both policies, pollution was defined as the "discharge, dispersal, release or escape of" a virus. AIG cannot have it both ways—either the spread of the coronavirus is pollution or it is not, and AIG cannot take blatantly contradictory positions regarding the meaning of the term "pollution" simply to benefit itself at the expense of its insured. AIG's contradictory positions with respect to this and other policy terms are indicative of its bad faith.

14. After receiving notice of Cedars-Sinai's claim on or about May 18, 2020, Ironshore responded on July 6, 2020, with a letter reserving its rights but not expressly denying coverage. To date, Ironshore has neither accepted nor denied coverage for Cedars-Sinai's claims.

## B. THE POLICIES PROVIDE BROAD COVERAGE FOR LOSSES DUE TO VIRUS WITHOUT ANY PHYSICAL LOSS OR DAMAGE REQUIREMENT

15. In order to charge higher premiums, AIG promoted its pollution coverage as best-in-class, in part because it expressly included coverage for

"viruses and bacteria."  Cedars-Sinai paid over $335,888 in premiums to AIG— and paid Ironshore an additional $124,723.04—in order to obtain that supposedly superior coverage.

16.    Cedars-Sinai procured the Policies at great cost precisely to insure against the losses that it has incurred.  Among other features, the Policies protected Cedars-Sinai against the potentially catastrophic risks posed by outbreaks of a deadly and highly contagious virus.  Cedars-Sinai had the foresight to realize that in such circumstances, its health care system would (and in fact, did) face an especially high risk that viral outbreaks would result in substantial losses, including cleanup costs and business interruption damages.

17.    A copy of the Primary Policy provided by AIG is attached hereto as Exhibit A.  A copy of the Excess Policy provided by Ironshore is attached hereto as Exhibit B.

18.    AIG issued the Primary Policy to Cedars-Sinai for the Policy Period from May 27, 2015 to May 27, 2020.  Ex. A, Declarations Item 2.  The Primary Policy provides up to $50 million in coverage for each incident and in the aggregate, subject to a $100,000 deductible.  *Id.*, Items 3 & 4.  Cedars-Sinai's losses far exceed the Primary Policy's deductible.

19.    Ironshore issued the Excess Policy to Cedars-Sinai for the same Policy Period (May 27, 2015 to May 27, 2020).  Ex. B, Declarations Item 2.  The Excess Policy provides up to $50 million in coverage for each incident and in the aggregate, excess of the $50 million in coverage provided under the Primary Policy.  *Id.*, Items 3 & 4.  The Excess Policy follows the form of the Primary Policy and provides coverage "in accordance with the same terms, conditions, exclusions, limitations and warranties" as are contained in the Primary Policy.  Ex. B, Environmental Excess Liability Coverage Form § I.A.1.

20.    The Policies also cover ongoing losses that continue beyond the expiration date of the Policies, so long as those losses commenced during the

policy period.

21.     The Policies provide a wide range of coverages applicable to Cedars-Sinai's COVID-related losses, including:

    i.    Coverage A – On-Site Clean-Up of Pollution Conditions, Ex. A § I.A.;

    ii.    Coverage B – Legal Liability for Pollution Conditions, *id.*;

    iii.    Coverage C – Emergency Response Costs, *id.*; and

    iv.    Coverage D – Business Interruption Coverage, *id.* at Endorsement No. 1.

These coverages, as alleged in greater detail below, reflect Defendants' deliberate decision to provide coverage for virus-related losses.

22.     Importantly, none of the Policies' applicable coverages require proof of any direct physical loss or damage to property in order to trigger coverage.  In other words, so long as Cedars-Sinai's losses are linked to the presence and/or cleanup of the virus, they are covered – whether or not Cedars-Sinai demonstrates that the virus caused direct physical damage to tangible property.

23.     Cedars-Sinai has satisfied all material conditions for coverage under each of the above insuring agreements in the Policies, including any reporting conditions.

24.     As the first Named Insured in the Policies, Cedars-Sinai has the right to operate on behalf of all other Insureds in connection with obtaining coverage under the Primary Policy, and does so by this Complaint.  Ex. A, Declarations Item 1 (listing "Cedars-Sinai Medical Center" as the "Named Insured" under the Primary Policy); Ex. B., Environmental Excess Liability Declarations Item 1 (same under the Excess Policy).

**1.     The Policies Cover Clean-Up Costs (Coverage A)**

25.     Under Coverage A, AIG agreed to "pay on behalf of the Insured, Clean-Up Costs resulting from Pollution Conditions on or under an Insured

Property if such Pollution Conditions are discovered by the Insured during the Policy Period[.]" Ex. A § I.A.

26.     The Policies define "Clean-Up Costs" to include:

> [R]easonable and necessary expenses . . . for the ***investigation***, removal, ***abatement***, ***remediation*** including associated ***monitoring***, or disposal of . . . Microbial Matter . . . or other contamination: 1. To the extent required by Environmental Laws [or] . . . 5. ***With respect to viruses*** . . . as defined by the Center for Disease Control, in the absence of Environmental Laws, to the extent required in writing by the Center for Disease Control or local health department.

Ex. A, Endorsement No. 1 § 2.C. (emphases added).

27.     The Policies define "Environmental Laws" as "any federal, state, provincial or local laws (including, but not limited to, statutes, rules, regulations, ordinances, ***guidance documents***, and governmental, judicial or administrative orders and directives) that are applicable to Pollution Conditions." Ex. A § VIII.F. (emphasis added).

28.     "Pollution Conditions" include "the ***discharge, dispersal***, release or escape ***of viruses*** . . . as defined by the Centers for Disease Control." Ex. A, Endorsement No. 1 § 2.S.3. (emphasis added). Coronavirus is a virus as defined by the Centers for Disease Control and Prevention ("CDC").

29.     The discharges, dispersals, releases, and/or escapes of the coronavirus throughout Cedars-Sinai's properties constitutes "Pollution Conditions" under the Policies for which Cedars-Sinai has incurred substantial Clean-Up Costs required by Environmental Laws (including guidance documents issued by the CDC and other health regulatory bodies).

**2.     The Policies Cover Legal Liability for Pollution Conditions (Coverage B)**

30.     Under Coverage B, Defendants agreed to "pay on behalf of the Insured, Loss that the Insured is legally obligated to pay as a result of Claims for

Bodily Injury, Property Damage or Clean-Up Costs resulting from Pollution Conditions[.]" Ex. A § I.A.

31.    The Policies define "Claim" as "a written demand received by the Insured alleging liability or responsibility and seeking a remedy on the part of the Insured for Loss." *Id*. § VIII.B.

32.    The Policies define "Bodily Injury" as "physical injury, or sickness, disease, mental anguish or emotional distress ***sustained by any person***, including death resulting therefrom." *Id*. § VIII.A. (emphasis added).

33.    The Policies define "Loss", in relevant part, as "(1) monetary awards or settlements of compensatory damages for Bodily Injury . . ., and where allowable by law, punitive, exemplary, or multiple damages, and civil fines, penalties, or assessments for Bodily Injury …; [and] (2) costs, charges and expenses incurred in the defense, investigation or adjustment of [these] Claims. . . ." *Id*. § VIII.N.

34.    The Primary Policy further states that AIG has the "duty to defend such Claim, even if groundless, false, or fraudulent." *Id.* § I.B.  The Excess Policy states that Ironshore "shall have the right but not the duty to assume charge of the defense or settlement of any claim or suit against the insured to which this policy may apply upon exhaustion of the applicable limits of insurance of the underlying insurance." Ex. B § IV.A.1.

35.    As described below, Cedars-Sinai has incurred significant coronavirus-related losses, within the meaning of the Policies, from Claims for Bodily Injury resulting from Pollution Conditions on Insured Properties.

36.    AIG has a contractual duty to defend Cedars-Sinai against said Claims.

**3.    The Policies Cover Emergency Response Costs (Coverage C)**

37.    Under Coverage C of the Primary Policy, AIG agreed to "pay Emergency Response Costs resulting from Pollution Conditions" that are incurred

by Cedars-Sinai and reported to AIG during the Policy Period.  Ex. A § I.A.

38.    The Primary Policy defines "Emergency Response Costs" as "reasonable and necessary expenses . . . incurred in the remediation of . . . contamination that must be incurred:  1.  In response to Pollution Conditions that necessitates immediate action, and 2.   Within ninety-six (96) hours of the first commencement of such Pollution Conditions, *or* as approved by [AIG] in writing." Ex. A, Endorsement No. 1 § 2.H. (emphasis added).

39.    As described below, Cedars-Sinai has incurred covered Emergency Response Costs resulting from the presence of the coronavirus on Insured Properties, within the meaning of the Primary Policy.

40.    Cedars-Sinai is contractually entitled to reimbursement by AIG for said Emergency Response Costs.

## 4.    The Policies Cover Cedars-Sinai's Business Interruptions (Coverage D)

41.    Under Coverage D, Defendants agreed, in part, to "pay the Insured's Actual Loss . . . and Extra Expense to the extent it reduces Actual Loss . . . resulting from an Interruption caused directly by Pollution Conditions on or under the Insured Property that result in Clean-Up Costs covered by this Policy."  Ex. A, Endorsement No. 1 § 1.

42.    The Policies define "Actual Loss" as the:  "1.  Net income (net profit or loss before income taxes) the Insured would have earned or incurred had there been no Interruption, and 2.   Continuing normal operating expenses incurred, including Ordinary Payroll Expense."  *Id.* § 3.

43.    The Policies define "Extra Expense" as "necessary expenses . . . the Insured incurs during the Period of Restoration[:]   1.  That would not have been incurred if there had not been an Interruption, and 2.  That avoid or minimize an Interruption, but only to the extent such expenses reduce Actual Loss . . . ."  *Id.*

44.    The Policies define "Interruption" as "the necessary suspension of the Insured's business operations at an Insured Property during the Period of

Restoration." *Id.*

45.    The Policies define "Period of Restoration" in relevant part as "the length of time as would be required with the exercise of due diligence and dispatch to restore the Insured Property to a condition that allows the resumption of normal business operations, commencing with the date operations are interrupted by Pollution Conditions."   Importantly, the Period of Restoration is "***not limited by the date of expiration of the Policy Period.***" *Id.* (emphasis added).

46.    Cedars-Sinai has incurred covered Actual Loss and Extra Expense, within the meaning of the Policies, resulting from the necessary suspensions of its business operations at Insured Properties due to the SARS-CoV-2 virus including, but not limited to, closures to perform enhanced cleaning protocols and cancellations of elective surgical procedures.

47.    The foregoing recitations of policy provisions are not intended to be a complete statement of all relevant policy language, and the entire Policies are incorporated by reference into these claims.

## C.    CEDARS-SINAI INCURRED SUBSTANTIAL LOSSES COVERED UNDER THE POLICIES' PROVISIONS

### 1.    The Policies Cover Cedars-Sinai's Clean-Up Costs.

48.    Coverage A provides coverage for the Clean-Up Costs that Cedars-Sinai incurred as a direct result of the discharge and dispersal of the coronavirus on its insured properties.

49.    Carriers of the SARS-CoV-2 virus – even asymptomatic ones who do not have the disease of COVID-19 – discharged particles of virus-laden fluid by coughing, sneezing, talking, or merely breathing.

50.    Each COVID-positive patient that entered and was treated at Cedars-Sinai's hospitals and its other medical facilities thus discharged the virus, which was then necessarily dispersed throughout these insured properties.   By way of example, in 2020 alone Cedars-Sinai documented no fewer than 6,451 instances in

which COVID-positive patients spread coronavirus on Cedars-Sinai's properties. An anonymized chart detailing the date and location of these positive tests is attached hereto as Exhibit C. Furthermore, due to a shortage of COVID-19 tests in 2020, that figure is almost certainly a drastic undercount of the actual number of COVID-positive patients at Cedars-Sinai during this time (and an even greater undercount of the number of asymptomatic carriers at Cedars-Sinai).

51.    As a direct result of such virus-caused Pollution Conditions, Cedars-Sinai incurred more than $26,847,921 in additional Clean-Up Costs between March 2020 and February 2021 than in the previous twelve-month period, which includes: (1) $1,247,179 in cleaning supplies, including the incremental cost of disinfecting wipes, hand sanitizer, alcohol and other disinfectants used to remediate viral contamination; (2) $19,074,880 for personal protective equipment, including the incremental cost of gloves, gowns, masks, respirators, shields and other PPE used to abate contamination; (3) $246,553 in third-party disinfection services to remediate and abate virus contamination; (4) $2,431,947 in other non-labor costs for monitoring, remediating and abating virus contamination, including the incremental cost of infrared thermometers for patient and employee screening, social distancing signs as required by health regulators, and sneeze guards to protect personnel from contamination; (5) $2,443,821 in masks distribution and temperature checking labor costs, including the incremental costs to distribute PPE and take temperatures for patient and employee screening to monitor and abate virus contamination; and (6) $1,403,541 in other necessary labor, including the incremental costs for PPE supply management, reprocessing, distributing and producing PPE, and hand sanitizer production to abate virus contamination.

52.    Cedars-Sinai's Clean-Up Costs were required by Environmental Laws, as defined in the Policies, including guidance documents from the CDC and/or local health departments.

**2.    The Policies Cover Cedars-Sinai's Legal Liability.**

53. Cedars-Sinai also incurred covered Loss for patient and employee Bodily Injury Claims resulting from the virus-caused Pollution Conditions described above, for which Cedars-Sinai is entitled to a defense and indemnification under Coverage B.

54. For example, Cedars-Sinai has paid more than $900,000 for claims stemming from Bodily Injury caused by the virus to date.

55. Additionally, numerous employees have brought lawsuits against Cedars-Sinai stemming from the requirement that they be vaccinated against the coronavirus. These Bodily Injury Claims (which include emotional distress claims), have resulted in more than $250,000 in covered defense costs to date for which AIG has wrongfully failed to reimburse Cedars-Sinai.

**3.    The Policies Cover Cedars-Sinai's Emergency Costs.**

56. As a direct result of the virus-caused Pollution Conditions described above, Cedars has incurred Emergency Response Costs that are covered under Coverage C of the Policies.

57. Cedars-Sinai incurred reasonable and necessary expenses in the remediation of COVID-related Pollution Conditions on Insured Properties within the first 96 hours of the first known cases of COVID-19 at its hospitals and medical facilities, necessitating immediate action. These Emergency Response Costs include, as alleged more fully above, cleaning supplies, personal protective equipment, third-party disinfection services, other non-labor costs for monitoring, preventing, and removing viral contamination; mask distribution and temperature monitoring of personnel; and other necessary labor expenses to abate the viral contamination.

**4.    The Policies Cover Cedars-Sinai's Business Interruptions.**

58. Cedars-Sinai has incurred Actual Loss and Extra Expense resulting from the necessary suspension of Cedars-Sinai's business operations as a direct

1    result of the virus-caused Pollution Conditions described above.  Those costs are
2    covered under Coverage D of the Policies.

3         59.    At various times, Cedars-Sinai had to close or suspend its business
4    operations, in whole or in part, due to the presence of the coronavirus at its
5    hospitals and other medical facilities.   Among other measures, it was forced to
6    perform enhanced cleaning protocols, to cancel elective surgical procedures, and to
7    implement unit or facility closures and capacity limitations.  Those measures were
8    undertaken both to remediate and to abate the spread of the coronavirus.
9    Thousands of elective surgeries and other medical procedures scheduled by
10   patients with commercial health insurance—which make up a substantial portion
11   of Cedars-Sinai's revenue—were also cancelled.   As a direct result of such
12   COVID-related losses, Cedars-Sinai's revenue in 2020 was substantially lower
13   than in 2019  An anonymized chart detailing Cedars-Sinai's business interruption
14   losses for the period of March through June 2020 is attached hereto as Exhibit D.
15   Cedars-Sinai suffered Actual Loss of net income of at least $141,920,663 solely
16   during the period of March 2020 through June 2020 alone.   Additionally, as
17   described above, Cedars-Sinai incurred at least $26,847,921 in recoverable Extra
18   Expense under its Primary Policy with AIG.

19   **D.    AIG'S BAD-FAITH DELAY AND DENIAL OF COVERAGE**

20        60.    On May 18, 2020, Cedars-Sinai promptly and timely tendered its
21   claim to AIG.

22        61.    After delaying nearly a year before providing any coverage position,
23   on April 6, 2021, AIG sent a letter to Cedars-Sinai setting forth AIG's purported
24   "reservation of rights" to limit or deny coverage for Cedars-Sinai's claim.
25   Notably, AIG's April 6, 2021 letter adjusted Cedars-Sinai's claim for only two
26   Insured Properties, and did so only under Coverage A.

27        62.    In its April 6, 2021 letter, AIG acknowledged that "information
28   regarding people diagnosed or suspected of having COVID-19 at the properties, or

14

AMENDED COMPLAINT FOR DECLARATORY RELIEF,
BREACH OF CONTRACT, AND BREACH OF IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING

Exhibit 1
16

COVID-19 existing on any surfaces at the properties," would suffice to demonstrate the "discharge, dispersal, release or escape of COVID-19 on or under the Insured Properties." AIG's letter further invited Cedars-Sinai to provide additional claim information including, for example, "all known and reasonably obtainable information regarding the time, place, cause, nature and other circumstances of the Pollution Conditions."

63. Cedars-Sinai gathered voluminous evidence to respond to AIG's requests for information in its April 6, 2021 letter.

64. On September 6, 2022, Cedars-Sinai identified and described in detail (a) the Clean-Up Costs that Cedars-Sinai had incurred to investigate and remediate the Pollution Conditions resulting from the presence of the coronavirus on its Insured Properties, (b) the governmental orders and guidance documents that required such costs, (c) third-party Claims for Bodily Injury that Cedars-Sinai had received, and (d) the necessary suspensions of business operations that Cedars-Sinai incurred to remediate the virus contamination. Cedars-Sinai also corrected AIG and confirmed that Cedars-Sinai was requesting coverage under Coverages A, B, C and D for losses related to all of its Insured Properties—not simply Coverage A, as AIG had incorrectly assumed.

65. Outside counsel for AIG responded by letter dated November 17, 2022. In this letter, which was sent almost exactly 1.5 years to the day after Cedars-Sinai provided initial notice of claim, AIG for the first time expressed doubt that it had any duty to cover the hospital's direct losses or to defend or indemnify Cedars-Sinai against third-party claims under any and all of the four Coverages A, B, C and D. In this letter, AIG's outside counsel requested more information about Cedars-Sinai's claim, and reserved AIG's purported right to deny coverage under the Coverages in question.

66. In this letter, AIG's outside counsel took positions that were in stark contrast to the positions taken by AIG's in-house personnel in previous

correspondence.    For example, in contrast to AIG's April 6, 2021 letter acknowledging that "information regarding people diagnosed or suspected of having COVID-19 at the properties, or COVID-19 existing on any surfaces at the properties" would suffice to demonstrate the "discharge, dispersal, release or escape of COVID-19 on or under the Insured Properties," outside counsel's November 17, 2022 letter newly asserted that "the presence of a virus is not a discharge, dispersal, release or escape" within the Primary Policy's definition of "Pollution Condition."  Outside counsel nevertheless did not expressly state that AIG was denying coverage, but instead requested additional, voluminous items of information, including any "specific information regarding the release of COVID-19 at each of the various locations for which [Cedars-Sinai] seeks coverage."

67.    Remarkably, AIG's newfound contention on November 17, 2022 – that the coronavirus' presence did not constitute a covered Pollution Condition under the Primary Policy – was exactly the opposite of AIG's previous position, when it denied coverage under a different Cedars-Sinai policy that *excluded* coverage for Pollution Conditions.  Specifically, when Cedars-Sinai previously requested coverage for its COVID-related losses under a first-party property policy, an AIG subsidiary denied coverage *based on an express exclusion for "Pollution, Contamination, [and] Debris Removal,"* which was worded to apply to the "release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS," including "bacteria, virus, or hazardous substances." AIG Letter to Cedars-Sinai, Re: Policy No. 020412869, for the Policy Period of June 11, 2019–June 11, 2020, attached hereto as Exhibit E. (emphasis added) (The exclusion in the property policy is the mirror image of the coverage grant for "Pollution Conditions" in the Primary Policy at issue here, which includes the "discharge, dispersal, release or escape of viruses or bacteria.").  AIG expressly stated that its denial of coverage under its first-party property policy was based on the "actual, alleged or threatened release, discharge, escape or dispersal of the

AMENDED COMPLAINT FOR DECLARATORY RELIEF,
BREACH OF CONTRACT, AND BREACH OF IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING

1  SARS-CoV-2 virus" at Cedars-Sinai's insured properties.  *Id.*

2      68.    In other words, in November 2022, AIG abandoned its prior position

3  that the SARS-CoV-2 virus was "pollution" for purposes of the Primary Policy at

4  issue in this case.  Instead, AIG assumed a "heads-we-win, tails-you-lose" position,

5  denying coverage under this pollution policy because SARS-CoV-2 is ***not***

6  pollution, but denying coverage under the first-party property policy because

7  SARS-CoV-2 ***is*** pollution.   This opportunistic policy interpretation is the soul of

8  insurer bad faith.

9      69.    AIG's contorted flip-flop is especially noteworthy considering that

10  AIG has repeatedly asserted – successfully, in other cases – that all coronavirus-

11  related damages are barred by exclusions for the discharge, dispersal, release or

12  escape of viruses or bacteria found in typical business interruption policies (but not

13  found in Cedars-Sinai's Primary Policy).  For example:

14      i.    In *Circus Circus LV, LP v. AIG Specialty Insurance Co.*, 525 F. Supp.

15            3d 1269 (D. Nev. 2021) ("*Circus Circus I*"), *aff'd*, No. 21-15367

16            ("*Circus Circus II*"), 2022 WL 1125663 (9th Cir. Apr. 15, 2022), AIG

17            successfully argued that there was no coverage for the presence of the

18            coronavirus on property because the policy at issue in that case

19            excluded "[t]he actual, alleged or threatened release, discharge, escape

20            or dispersal of" a "virus." *Id.* at 1273.  The court found that that the

21            insured's pleadings "support a finding that the virus has been released,

22            dispersed, and discharged into the atmosphere, resulting in infections

23            and transmissions."  *Id.* at 1278 (footnote omitted); *see also Circus*

24            *Circus II*, 2021 WL 3027127, at *6 (July 9, 2021) (AIG's Answering

25            Brief, attached hereto as Exhibit F).

26      ii.   In *TP Racing LLLP v. American Home Assurance Co.*, No. 21-cv-

27            00118, 2021 WL 4851430 (D. Ariz. Oct. 13, 2021) ("*TP Racing I*"),

28            *aff'd*, No. 21-16910 ("*TP Racing II*"), 2023 WL 3750395 (9th Cir.

June 1, 2023), AIG-subsidiary American Home Assurance Company argued that "because COVID-19 is a virus, any alleged property damage caused by the virus is excluded from coverage under the Pollutant or Contaminant Exclusion[,]" which "exempts coverage for 'loss or damage caused directly or indirectly' by '[t]he actual, alleged or threatened release, discharge, escape or dispersal' of a 'virus.'" *Id.* at \*1–2; *see TP Racing II*, 2022 WL 1532110, at \*7 (May 6, 2022) (same) (AIG's Answering Brief, attached hereto as Exhibit G).

iii.   In *Northwell Health, Inc. v. Lexington Insurance Co.*, 550 F. Supp. 3d 108 (S.D.N.Y. 2021), AIG-subsidiary Lexington Insurance Company argued that a Pollution or Contamination Exclusion for the "discharge" or "dispersal" of a "virus" applied to the presence of the coronavirus on insured property.  *See id.* at 121.  The court agreed, stating, "COVID-19 is spread by the respiratory droplets emitted 'when an infected person talks, sneezes, or coughs.' . . .  What is a sneeze or cough if not a discharge or dispersal?"  *Id.* (citation omitted); *see also Northwell Health, Inc. v. Lexington Ins. Co.*, No. 1:21-cv-001104, 2021 WL 1707359, at \*15 (S.D.N.Y. Apr. 29, 2021) (AIG's opposition to plaintiff's motion for partial summary judgment arguing that coverage for the virus' presence was excluded under an exclusion for "any 'actual, alleged or *threatened* release, discharge, escape or dispersal of contaminants,' . . . [where] Contaminants, in turn, are defined to include any '*virus*'") (emphasis in original) (citations omitted) (attached hereto as Exhibit H).

AIG's position here is directly at odds with the positions that AIG and its subsidiaries have advanced in courts across the country.

70.   Notwithstanding the substantial documentation already provided by Cedars-Sinai, AIG's November 17, 2022 letter demanded voluminous and in many

cases duplicative information.  At considerable expense, Cedars-Sinai responded to this request by providing detailed information by letter dated July 24, 2023.  That information included details regarding the types of costs and amounts that Cedars-Sinai had incurred to remediate virus contamination at Insured Properties; a list of dozens of governmental orders and guidance documents that required such remedial measures to be taken; and the attendant costs of those measures.  (In this letter, Cedars-Sinai also objected to AIG's inconsistent positions and mischaracterizations of coverage language and facts.).

71.    This additional information had no effect on AIG's position.    On November 14, 2023, counsel for AIG sent a letter maintaining AIG's denial of coverage for each of the Primary Policy's relevant insuring agreements.    The November 14, 2023 letter also identified purported shortcomings in the information that Cedars-Sinai had provided.    For example, AIG took the astonishing position that Cedars-Sinai was required, but had failed, to perform the plainly impossible task of linking specific cleanup costs to particular patients who had tested positive for COVID-19. *See* AIG's Counsel's letter to K. Jackson, dated November 14, 2023, attached hereto as Exhibit I (asserting that Cedars-Sinai had not provided sufficient evidence of Clean-Up Costs resulting from releases of SARS-CoV-2 because Cedars-Sinai had not "identif[ied] which Clean-Up Costs resulted from the presence of the individuals who tested positive" at Insured Properties).  In other words, as a phantom condition of coverage, AIG insisted that Cedars-Sinai undertake the impossible task of linking each incurred cost—each bottle of cleaning solution, each mask, and so on—to each one of the ***thousands of individuals*** who had tested positive for COVID at its hospitals and other medical facilities.  That requirement does not appear anywhere in the Primary Policy, and its fabrication is further evidence of AIG's bad faith.

72.    In each of Cedars-Sinai's letters providing additional explanation and evidence in support of its claim, Cedars-Sinai requested that AIG provide

confirmation of the possibility of coverage in connection with its requests for additional information.  AIG never provided any confirmation that it might provide coverage based on any additional information it requested, but requested such additional information nevertheless.  Rather than investigate Cedars-Sinai's claim in good faith, AIG continued to move the goalposts, repeatedly increasing its demand for information without ever explaining why it needed that information or why the previously requested information—duly provided by Cedars-Sinai—was insufficient, and without any assurance that if the claim was documented to AIG's satisfaction, then coverage would be provided.

73.    There is no reasonable basis in law or fact for AIG's denial of coverage.  Nor is there any reasonable basis in law or fact for AIG's continual requests for additional information regarding Cedars-Sinai's claim notwithstanding the voluminous information that Cedars-Sinai has provided, which reasonably should have been sufficient for AIG to adjust Cedars-Sinai's claim and provide coverage.

## E.    IRONSHORE'S BAD-FAITH REFUSAL TO PROVIDE A COVERAGE POSITION

74.    On or about May 18, 2020, Cedars-Sinai promptly and timely tendered its claim to Ironshore.

75.    On July 6, 2020, Ironshore responded by acknowledging its Excess Policy "follows form, in certain respects, to [the] primary layer environmental liability policy issued to [Cedars-Sinai] by AIG Specialty Insurance Company . . . except where otherwise noted in the Ironshore Policy."   *See* July 6, 2020 Letter from Julie K. York to Pamela Hamilton (attached hereto as Exhibit J).  Ironshore further stated that the "terms, conditions and exclusions of the AIG Policy, therefore, determine the extent of coverage available under the Ironshore Policy, if at all, subject to applicable law and subject to any differences in the AIG Policy."  Nonetheless, Ironshore stated that it "controls its own coverage position relative to

AMENDED COMPLAINT FOR DECLARATORY RELIEF, BREACH OF CONTRACT, AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Exhibit 1
22

this matter," and "reserve[d] its right to adopt positions and interpretations of coverage under the AIG Policy that may differ from those taken by AIG." Ironshore stated that it would "refrain from issuing a formal coverage letter" pending AIG's taking a position.

76. Since July 6, 2020, Ironshore has not provided a formal coverage position to Cedars-Sinai. Instead, Ironshore has taken and continues to take a "wait and see" approach even as its insured's losses mounted, quickly exceeding the underlying policy's $50 million limits.

## **FIRST CAUSE OF ACTION**

### **(Declaratory Relief)**

77. Cedars-Sinai reasserts and incorporates by reference all of the above allegations.

78. Cedars-Sinai is entitled to coverage under the Policies that Defendants issued to Cedars-Sinai for losses due to the coronavirus, as alleged in this Complaint and as to be proven at trial.

79. Based on information and belief, Defendants contend (based, *inter alia,* on their years-long refusal to issue formal coverage positions and on AIG's escalating and burdensome requests for unnecessary and/or irrelevant information) that they do not have an obligation to cover Cedars-Sinai's losses arising from the coronavirus under the Policies, as described in the preceding Paragraphs. Defendants have paid nothing at all to date on Cedars-Sinai's claims. Regardless of Defendants' actual position, their unconscionable delay requires a judicial declaration as to the parties' respective rights and obligations under the Policies.

80. An actual controversy presently exists between Cedars-Sinai and Defendants with respect to the duties and obligations of Defendants under the Policies and with respect to Cedars-Sinai's entitlement to coverage. Among other issues on which, upon information and belief, an actual controversy exists, Cedars-Sinai seeks declarations from this Court, without limitation, that:

AMENDED COMPLAINT FOR DECLARATORY RELIEF, BREACH OF CONTRACT, AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

a.  Each coverage identified in the preceding Paragraphs is triggered by Cedars-Sinai's claims;

b.  All conditions precedent under the Policies have been satisfied or excused, or Defendants have either waived or are estopped from enforcing all conditions precedent under the Policies;

c.  No exclusions in the Policies apply to preclude or limit coverage for Cedars-Sinai's claim;

d.  The actual and suspected physical presence of the coronavirus on Insured Properties constitutes a Pollution Condition as defined under the Policies;

e.  Cedars-Sinai incurred Clean-Up Costs as defined in the Policies as a result of the actual and suspected physical presence of the coronavirus on Insured Properties;

f.  Cedars-Sinai incurred Legal Liability for Pollution Conditions, as defined in the Policies, as a result of the actual and suspected physical presence of the coronavirus on Insured Properties;

g.  Cedars-Sinai incurred Emergency Response Costs, as defined in the Policies, as a result of the actual and suspected physical presence of the coronavirus on Insured Properties;

h.  Cedars-Sinai incurred Business Interruption expenses, as defined, as a result of the actual and suspected physical presence of the coronavirus on Insureds Properties;

i.  Defendants are contractually obligated to indemnify Cedars-Sinai for Cedar-Sinai's Clean-Up Costs, Legal Liability for Pollution Conditions, Emergency Response Costs and Business Interruption expenses, as those terms are defined, as a result of the actual and suspected presence of the coronavirus on Insured Properties;

j.  Defendants are contractually obligated under the Policies to indemnify

1    Cedars-Sinai for any other covered categories of covered loss and

2    expenses; and

3    k.  California has a materially greater interest in protecting its residents

4    against breach of contract and bad faith by insurers than New York,

5    which bears no relationship to the insured or insured loss, such

6    that whatever effect the Ironshore Policy's New York "Choice of

7    Law" provision may have, it does not supplant California law with

8    respect to Cedars-Sinai's claims against Ironshore.

9    ## SECOND CAUSE OF ACTION

10    ### (Breach of Contract)

11    81.    Cedars-Sinai reasserts and incorporates by reference all of the above

12    allegations.

13    82.    The Policies are valid and enforceable contracts between Cedars-Sinai

14    and each Defendant, providing coverage designed to cover the losses occasioned

15    by the coronavirus.

16    83.    Cedars-Sinai is entitled to coverage up to the applicable limits of

17    liability, for the losses that it has incurred as a consequence of the coronavirus.

18    84.    No terms, conditions or exclusions in the Policies apply to bar or limit

19    coverage.

20    85.    Cedars-Sinai has complied with all applicable provisions of the

21    Policies, or is otherwise excused from compliance therewith.

22    86.    Defendants have unjustifiably failed to pay for Cedars-Sinai's covered

23    losses and are in breach of the Policies.

24    87.    As a direct and proximate result of Defendants' breach of the Policies,

25    Cedars-Sinai has suffered and continues to suffer substantial damages.

26    88.    Cedars-Sinai is entitled to an award of tens of millions of dollars in

27    damages (the precise amount to be established at or before trial), as a result of

28    Defendants' breach of the Policies, as well as pre- and post-judgment interest and

AMENDED COMPLAINT FOR DECLARATORY RELIEF, BREACH OF CONTRACT, AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

any other costs and relief that this Court deems just and appropriate.

## THIRD CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

89.   Cedars-Sinai reasserts and incorporates by reference all of the above allegations.

90.   The Policies are valid contracts between Cedars-Sinai and each Defendant.

91.   Every contract imposes upon the contracting parties the duty of good faith and fair dealing, which requires that one party refrain from conduct that would prevent the other party from achieving its benefit of the bargain.

92.   Cedars-Sinai justifiably expected that Defendants would compensate it for covered losses and expenses pursuant to its Policies.

93.   In tortious breach of the implied covenant of good faith and fair dealing, Defendants committed the acts alleged in the preceding Paragraphs for the purpose of consciously withholding from Cedars-Sinai the rights and benefits to which it is entitled under the Policies and without consideration of Cedars-Sinai's interests at least to the same extent as Defendants considered their own interests. In so doing, Defendants wrongly and unreasonably undermined Cedars-Sinai's reasonable expectations of coverage and breached the contract at issue.

94.   Defendants have breached the implied covenant of good faith and fair dealing by, among other things:

    i.    With respect to AIG, unreasonably demanding volumes of prohibitively costly information from Cedars-Sinai, and other information virtually impossible to obtain, that AIG falsely contended did not establish coverage, under circumstances where AIG had no intention of changing its denial of coverage regardless of the information that Cedars-Sinai provided (*see* Cal. Code Regs. Tit. 10, § 2695.7(d) ("Every insurer shall conduct and diligently pursue a

thorough, fair and objective investigation and shall not persist in seeking information not reasonably required for or material to the resolution of a claim dispute."));

ii.  With respect to AIG, falsely insisting that Cedars-Sinai did not and/or could not establish a right to coverage under the Primary Policy when Cedars-Sinai had in its possession, and provided to AIG, detailed information that proved otherwise;

iii. With respect to both Defendants, failing repeatedly to provide a timely response to Cedars-Sinai's communications, failing to provide a timely coverage determination, and failing to provide any justification for their inexcusable delays in adjusting Cedars-Sinai's claim (*see id.* § 2695.5(b) ("Upon receiving any communication from a claimant, regarding a claim, that reasonably suggests that a response is expected, every licensee shall immediately, but in no event more than fifteen (15) calendar days after receipt of that communication, furnish the claimant with a complete response based on the facts as then known by the licensee."); *id.* § 2695.7(b) ("Upon receiving proof of claim, every insurer, except as specified in subsection 2695.7(b)(4) below, shall immediately, but in no event more than forty (40) calendar days later, accept or deny the claim, in whole or in part."));

iv.  With respect to AIG, misrepresenting in its November 17, 2022 letter that "the presence of a virus is not a discharge, dispersal, release or escape" within the Primary Policy's definition of "Pollution Condition," despite its prior acknowledgment to the contrary for self-serving purposes both with respect to Cedars-Sinai and other insureds, thereby wrongfully placing AIG's own interests above those of its insureds (*see id.* § 2695.7(d));

v.   With respect to AIG, misrepresenting that Cedars-Sinai had failed to

provide sufficient evidence of a Pollution Condition despite Cedars-Sinai having provided AIG with voluminous evidence of individuals who had tested positive for the virus at Insured Properties (*see id.*);

vi.   With respect to AIG, misrepresenting that the Primary Policy does not provide any coverage for Cedars-Sinai's claim;

vii.  With respect to AIG, misrepresenting the above facts in an attempt to explain AIG's untenable positions with respect to coverage; and/or

viii. With respect to both defendants, willfully ignoring facts contrary to their position in rejecting Cedars-Sinai's claim.

95.  Defendants' aforementioned and ongoing conduct is unreasonable and also constitutes oppression, fraud, and/or malice.   Specifically, Defendants, by acting as alleged in the preceding Paragraphs, consciously and without cause disregarded Cedars-Sinai's rights in bad faith, during a time of crisis as Cedars-Sinai sustained substantial losses.   Defendants, by their conduct, have rejected Cedars-Sinai's claim without any reasonable basis and with knowledge, or reckless disregard, of the fact that no reasonable basis supports withholding payment for the claim.  Defendants' acts are inconsistent with the reasonable expectations of their insured and are contrary to established claims practices and legal requirements and constitute bad faith.

96.  As a direct and proximate result of Defendants' bad-faith conduct, Cedars-Sinai has suffered and is entitled to recover tens of millions of dollars in damages (the precise amount to be established at or before trial), as well as consequential damages, punitive or exemplary damages, attorney's fees, and pre- and post-judgment interest to the extent permitted by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Cedars-Sinai prays for judgment against Defendants as follows:

97.  A declaration of the Parties' respective rights and obligations,

including, without limitation, a declaration concerning the applicable law, the terms and conditions of Cedars-Sinai's coverage and its right to coverage, as well as the non-applicability of any defenses that Defendants may seek to assert;

98.    An award of all damages of any nature to which Cedars-Sinai may be entitled under contract, at law or in equity, including, without limitation, compensatory damages, consequential damages, and/or punitive or exemplary damages;

99.    Pre- and post-judgment interest as provided by law and at the maximum rate permitted by law;

100.    An award of attorneys' fees and costs of suit incurred; and

101.    Such other and further relief as the Court deems just and proper.


DATED:  July 24, 2024              VORA LAW FIRM, P.C.


                                   By: /s/ Nilay U. Vora
                                   Nilay U. Vora (Cal. Bar No. 268339)
                                   nvora@voralaw.com
                                   Jeffrey A. Atteberry (Cal. Bar No. 266728)
                                   jatteberry@voralaw.com
                                   201 Santa Monica Blvd, Ste 300,
                                   Santa Monica, CA 90401-2224
                                   Tel.: (424) 258-5190
                                   *Attorneys for Plaintiff*
                                   *Cedars-Sinai Medical Center*
                                   *as to Defendant AIG Specialty Insurance*
                                   *Company*

                                   LATHAM & WATKINS LLP
                                   Kirsten C. Jackson (Cal. Bar No. 265952)
                                   kirsten.jackson@lw.com
                                   10250 Constellation Blvd., Suite 1100
                                   Los Angeles, California 90067
                                   Tel.: (424) 653-5500

                                   *Attorneys for Plaintiff*
                                   *Cedars-Sinai Medical Center*
                                   *as to Defendant Ironshore Specialty*
                                   *Insurance Company*

AMENDED COMPLAINT FOR DECLARATORY RELIEF, BREACH OF CONTRACT, AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

## JURY DEMAND

Plaintiff demands a trial by jury on all triable issues.

DATED:  July 24, 2024                    VORA LAW FIRM, P.C.


                                         By: /s/ Nilay U. Vora
                                         Nilay U. Vora (Cal. Bar No. 268339)
                                         nvora@voralaw.com
                                         Jeffrey A. Atteberry (Cal. Bar No. 266728)
                                         jatteberry@voralaw.com
                                         201 Santa Monica Blvd, Ste 300,
                                         Santa Monica, CA 90401-2224
                                         Tel.: (424) 258-5190


                                         *Attorneys for Plaintiff*
                                         *Cedars-Sinai Medical Center*
                                         *as to Defendant AIG Specialty Insurance*
                                         *Company*


                                         LATHAM & WATKINS LLP
                                         Kirsten C. Jackson (Cal. Bar No. 265952)
                                         kirsten.jackson@lw.com
                                         10250 Constellation Blvd., Suite 1100
                                         Los Angeles, California 90067
                                         Tel.: (424) 653-5500

                                         *Attorneys for Plaintiff*
                                         *Cedars-Sinai Medical Center*
                                         *as to Defendant Ironshore Specialty*
                                         *Insurance Company*

AMENDED COMPLAINT FOR DECLARATORY RELIEF,
BREACH OF CONTRACT, AND BREACH OF IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING