# EXHIBIT C

CEDARS-SINAI Medical Center

v.

AIG Specialty Insurance Company and Ironshore Specialty Insurance Company

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CASE No. 2:24-cv-02543-MCS-RAO

Expert Witness Report

March 17, 2025

Prepared by Benjamin J. Darrah, CPA

Director

Stout Risius Ross, LLC

One South Wacker Drive, 38th Floor

Chicago, IL 60606

**Introduction**

1. I have been retained by Latham & Watkins LLP ("Counsel"), counsel to Plaintiff Cedars-Sinai Medical Center ("Cedars-Sinai"), to calculate financial damages suffered by Cedars-Sinai arising out of an alleged breach of contract and bad faith insurance practices (the "Assignment"). I understand that Cedars is seeking reimbursement for business interruption losses (i.e. lost profits) and clean-up costs from its Pollution Legal Liability ("PLL") insurers, AIG Specialty Insurance Company ("AIG") and Ironshore Specialty Company ("Ironshore"), collectively, the "Insurers", for damages caused by SARS-CoV-2 ("COVID-19").

2. I have not been retained to opine on the merits of the allegations made by Cedars-Sinai in this case. Counsel has instructed me to assume the business interruption losses and incremental clean-up costs I calculate are reimbursable by Cedars-Sinai's Insurers. The AICPA and CIMA Forensic and Valuation Services Practice Aids "Calculating Lost Profits" and "Attaining Reasonable Certainty in Economic Damages Calculations" acknowledge that damages experts may assume that the plaintiff will prove its liability case and also assume causation on the instruction of retaining counsel.[1] I did, however, consider the causal link between the business interruption losses and incremental clean-up costs I calculate and COVID-19. I did not find any other causes of loss except for COVID-19.

**Documents and Information Considered**

3. In formulating my findings, I considered the documents and information identified in Exhibit A.

[1] AICPA & CIMA Forensic & Valuation Services Practice Aid "Calculating Lost Profits" (2020), page 14 and AICPA & CIMA Forensic & Valuation Services Practice Aid "Attaining Reasonable Certainty in Economic Damages Calculations" (2020), page 35.

4. The types of information I considered include certain documents produced by Cedars-Sinai and AIG/Ironshore during the course of litigation, certain legal filings made in this case, and certain publicly available information.

5. Stout has not conducted an independent audit of the financial statements of Cedars-Sinai and, accordingly, does not express an opinion on any such financial statements for any fiscal year ("FY"). The types of documents and information I have utilized in preparing this report are the type normally utilized by accounting experts providing testimony in litigation matters before a trier-of-fact. It is usual and customary for accounting experts to rely upon such sources of information in forming conclusions regarding the amount of damages.

6. This report summarizes my findings, observations, and opinions to date. Should additional documents or information become available for my review after the date of my report, I may update, supplement, amend, or revise my calculations or opinions.

**Expert Background and Qualifications**

7. I am employed as a Director in the Disputes, Claims, and Investigations practice of Stout Risius Ross, LLC ("Stout"). I have been employed by Stout since October 2022 following its acquisition of my former employer, The Claro Group, LLC ("Claro"), where I was employed beginning in June 2008. Prior to my employment at Claro, I was employed as an Audit Associate with PricewaterhouseCoopers ("pwc") in the Assurance practice from January 2007 through May 2008.

8. During my 14 years at Claro and continuing in my two years with Stout, I have performed a variety of economic, business, and financial analyses on behalf of clients in a consulting role as well as in a litigation support role. I have prepared fact and expert witness

testimony in the form of written reports for matters pending in United States Bankruptcy Court and International Arbitration in the United Kingdom. I have assisted policyholders and plaintiffs in calculating and supporting damages from insured losses comprised of property damage, business income/interruption, and third-party liability claims. I have prepared analyses quantifying damages totaling over $2.0 billion in various insurance claim and contractual litigation matters and participated in the resolution of those matters through litigation, arbitration, or negotiated settlements.

9. I earned a Bachelor of Business Administration in Accounting and Finance from Ohio University and I am a Registered Certified Public Accountant ("CPA") in the State of Illinois.[2] I have been a CPA since 2009, having sat for and passed all four parts of the required exam. I am also a member of the American Institute of Certified Public Accountants ("AICPA").

10. I have testified as an expert and via deposition in United States District Court one time in the last four years. I have testified as an expert in District Court Eagle County, Colorado, one time in the last four years and the Court of Iredell in the State of North Carolina, once in the last four years. My Curriculum Vitae is attached hereto as Exhibit B.

11. Stout is being compensated for services rendered on a time and expense basis, which is customary for expert engagements for our firm. My billing rate is $610 per hour.[3] Neither Stout's fees nor my compensation is contingent on the conclusions reached or ultimate resolution of the case.

---

[2] License # 239.023237

[3] I supervised the work of other Stout professionals in preparation of this report. Managers are being compensated between $400-$500 per hour and Associates/Analysts at $300-$350 per hour. In addition, it is best practice for a Managing Director or Senior Advisor to provide a secondary consideration of expert reports at Stout. Managing Directors/Senior Advisors are being compensated at $650 per hour.

**Summary of Opinions**

12. This section is intended to provide a summary of my opinions in this matter, the bases of which are more fully discussed and supported herein. Based on my experience, education, training and the results of my analysis, my opinions with regard to damages are as follows:

a. Opinion #1: Cedars-Sinai incurred $107,059,587 in incremental Clean-Up Costs and/or Extra Expenses as a result of the spread of COVID-19 throughout its CSMC location. Further, Cedars-Sinai incurred $3,792,831 in incremental Clean-Up Costs and/or Extra Expenses as a result of the spread of COVID-19 throughout its MRDH location.

b. Opinion #2: Cedars-Sinai incurred $548,223,249 in business interruption losses (i.e., lost profits) as a result of the spread of COVID-19 throughout its CSMC location. Further, Cedars-Sinai incurred $106,718,356 in business interruption losses (i.e., lost profits) as a result of the spread of COVID-19 throughout its MRDH location.

c. Opinion #3: Cedars-Sinai suffered damages in the amount of $737,944,023 in relation to Clean-Up Costs, Extra Expenses, and Business Interruption losses, including offsets for business interruption proceeds previously paid to Cedars-Sinai. This exceeds the $100,000,000 of available limits per the Policies.

**Background on Cedars-Sinai's Allegations**

13. Cedars-Sinai is one of the largest nonprofit academic medical centers in the United States, with a Level 1 trauma center and 886 licensed beds, 2,100 physicians, 2,800

nurses, and thousands of other healthcare professionals and staff.[4] It is also one of Southern California's largest acute care hospitals.[5] Because of this standing, during the first year of the COVID-19 pandemic, alone, Cedars-Sinai Medical Center facility ("CSMC") and its affiliate, Cedars-Sinai Marina del Rey Hospital ("MDRH") treated thousands of confirmed COVID-19 cases.[6]

14. As a result of the spread of COVID-19 throughout its insured properties, Cedars-Sinai sought coverage under AIG Commercial Pollution Legal Liability Policy No. PLC 18946438 (the "Primary Policy") and Ironshore Environmental Excess Liability Policy No. 002400100 (the "Excess Policy," and together with the Primary Policy, the "Policies") for Clean-up Costs, Emergency Response Costs, Business Interruption (i.e. lost profits) losses, and Extra Expenses.[7]

15. The Primary Policy provides up to $50 million in coverage for each incident and in the aggregate, subject to a $100,000 deductible. The Excess Policy provides up to $50 million in coverage for each incident and in the aggregate, excess of the $50 million in coverage provided under the Primary Policy.[8]

16. Up to this point in time, AIG has denied coverage to Cedars-Sinai under its Primary Policy. Ironshore has not provided a formal coverage position to Cedars-Sinai but has reserved its rights to adopt positions and interpretations of coverage that may differ from those taken by AIG, pending AIG's taking a position.[9]

17. As a result, Cedars-Sinai is seeking damages under the following causes of action:

---

[4] Plaintiff Cedars-Sinai Medical Center's First Amended Complaint, page 2.
[5] Ibid.
[6] Ibid.
[7] Ibid, page 4.
[8] Ibid, page 6.
[9] Ibid, pages 19-23.

a. Declaratory Relief[10]

b. Breach of Contract[11]

c. Breach of the Implied Covenant of Good Faith and Fair Dealing[12]

**Defining the Harm Sustained**

18. Considering Cedars-Sinai's allegations, I evaluated the potential harm(s) sustained by the Plaintiff. Fundamentally, Cedars-Sinai suffered losses in the form of incremental costs and lost profits due to COVID-19. Counsel instructed me to assume that those losses are recoverable under the Policies. Under that premise, Cedars-Sinai is financially harmed by not being reimbursed for funds it expended due to incremental COVID-19 related costs, for which it is contractually expected to be reimbursed up to the limits of the Policies issued by AIG and Ironshore. Further, in the case of the business interruption losses (i.e., lost profits), Cedars-Sinai is harmed by not being reimbursed for the profits which it would have earned "but for" COVID-19 and the subsequent alleged wrongful actions of AIG and Ironshore.

19. In addition, I understand Cedars-Sinai may seek pre- and post-judgment interest based on the amount and timing of damages described in my analysis, along with an award of attorneys' fees and costs of suit incurred. The calculation of such is generally reserved pending relevant rulings by the Court regarding the ultimate determination of damages. Accordingly, I reserve the right to calculate interest and fees if and when I am asked to do so.

---

[10] Ibid, page 21.
[11] Ibid, page 23.
[12] Ibid, page 24.

**Acceptable Damages Theories**

20. Several theories of damages exist in litigation, such as compensatory damages, consequential damages, punitive damages, and others. Compensatory (i.e. actual) damages compensate an aggrieved party for the loss of the bargain for which it negotiated. To put it in other words, compensatory damages are an amount sufficient to give the aggrieved party the same economic value it would have received if the other party had fulfilled its promise or duty.[13] Lost profits, for example, are a well-known and accepted measure of compensatory damages, whereby the net profits that would have been achieved but for the harmful act are calculated and then offset by the actual or mitigating profits following the harmful act.[14]

21. As it relates to this Assignment, I calculate compensatory damages for Cedars-Sinai based on the Clean-Up costs and Extra Expenses it incurred due to COVID-19 at its CSMC and MDRH facilities. Further, I calculate the business interruption (i.e. lost profits) compensatory damages based on the difference between (i) the profits Cedars-Sinai reasonably expected to earn prior to COVID-19, and (ii) the amounts Cedars-Sinai actually earned after COVID-19 at those same facilities.[15] I also consider relevant limits of the Policies at issue. My methods of estimating damages are consistent with industry publications, comparable disputes and matters, and my experience. I also performed my analysis in a manner that yields reasonable results (i.e. reasonable certainty) in accordance with relevant AICPA guidance.[16]

---

[13] AICPA & CIMA Forensic & Valuation Services Practice Aid "Calculating Lost Profits" (2020), page 19.
[14] Ibid, page 24.
[15] Ibid, page 12.
[16] AICPA & CIMA Forensics & Valuation Services Practice Aid, Attaining Reasonable Certainty in Economic Damages Calculations (2020).

**<u>Methodology and Analysis – Clean-Up Costs/Extra Expenses</u>**

22. In order to form my opinions regarding the damages incurred by Cedars-Sinai related to Clean-Up costs and Extra Expenses, I applied the following approach:

a. I obtained and utilized an extract from Cedars-Sinai's general ledger ("G/L") as produced by Paul Bouganim, Executive Director of Finance, to determine the population of non-internal labor related incremental COVID-19 Clean-Up costs and Extra Expenses.[17]

b. I verified the accuracy of the Clean-Up costs and Extra Expenses by comparing the G/L amounts to the supporting PDF invoices and payment registers.

c. I tested a sample of certain costs to verify that the costs were actually paid. Further, I relied upon Cedars-Sinai's internal controls to be reasonably certain that the costs incurred were paid.

d. I considered historical data and trends to ensure the Clean-Up costs and Extra Expenses were incremental as compared to historical operating expenses.

e. I considered potential offsets for costs reimbursed by other parties, to the extent applicable under the terms of the relevant Policies.

**Population of Clean-Up Costs and Extra Expenses**

23. Cedars-Sinai's internal finance department tracked, assembled, and produced detailed records to support incremental costs attributed to COVID-19, which included non-labor and labor related expenses from the first calendar quarter of 2020, January through

---

[17] COVID-19 Non-Labor Costs v2.xlsx.

March, through the second calendar quarter of 2023, April through June. Per my discussions with Counsel, I have focused on the non-labor related expenses.

24. Clean-Up Costs are defined in the Policies to include:

> *"[R]easonable and necessary expenses…for the investigation, removal, abatement, remediation including associated monitoring, or disposal of…Microbial Matter…or other contamination: 1. To the extent required by Environmental Laws [or]…5. With respect to viruses…as defined by the Center for Disease Control, in the absence of Environmental Laws, to the extent required in writing by the Center for Disease Control or local health department.*[18] *"*

25. Extra Expenses are defined in the Policies to include:

> *"…necessary expenses…the Insured incurs during the Period of Restoration[:] 1. That would not have been incurred if there had not been an Interruption, and 2. That avoid or minimize an Interruption, but only to the extent such expenses reduce Actual Loss…"*[19]

26. I relied upon the extracts provided by Cedars-Sinai's internal finance department to determine the potential incremental COVID-19 related, non-internal labor costs incurred at the CSMC and MRDH facilities.[20] As previously noted, Counsel has instructed me that the incremental COVID-19 related costs incurred by Cedars-Sinai are reimbursable by Cedars-Sinai's Insurers under the Policies. A summary of the non-internal labor costs incurred at each location, as produced by Cedars-Sinai is as follows:

---

[18] Plaintiff Cedars-Sinai Medical Center's First Amended Complaint, page 8. Also, AIGSpecialty-Cedars000053.
[19] Plaintiff Cedars-Sinai Medical Center's First Amended Complaint, page 10. Also, AIGSpecialty-Cedars000056-57.
[20] COVID-19 Non-Labor Costs v2.xlsx.

**Table 1. COVID-19 Related Incremental Non-Labor Costs**

| Covid-19 Related Incremental Non-Labor Costs | | | |
|---|---|---|---|
| **Cost Category** | **CSMC** | **MDRH** | **Cedars Total** |
| PPE | $ 23,563,578 | $ 300,531 | $ 23,864,110 |
| Cleaning Supplies & Disinfection Services | $ 1,522,742 | $ - | $ 1,522,742 |
| Screening & Safety Costs | $ 6,661,138 | $ - | $ 6,661,138 |
| Child Care Services | $ 31,997,402 | $ - | $ 31,997,402 |
| Alternate Care Locations (Expanded facilities for testing and surge) | $ 1,291,367 | $ 84,428 | $ 1,375,795 |
| COVID-19 Communications (newsletters and articles) | $ 5,338,333 | $ - | $ 5,338,333 |
| Hotel | $ 2,636,739 | $ 80,351 | $ 2,717,090 |
| Lab Supplies | $ 15,344,050 | $ 536,798 | $ 15,880,848 |
| Medical Equipment, parts and installation | $ 5,584,002 | $ 924,963 | $ 6,508,965 |
| Medical Supplies (Consumables) | $ 1,552,404 | $ 180,234 | $ 1,732,638 |
| COVID-19 Consulting Services | $ 1,403,153 | $ - | $ 1,403,153 |
| Office Equipment for Telecommuting | $ 885,029 | $ - | $ 885,029 |
| Telehealth | $ 1,682,271 | $ - | $ 1,682,271 |
| Vaccine supplies and services | $ 7,586,879 | $ - | $ 7,586,879 |
| Security Services | $ - | $ 403,604 | $ 403,604 |
| Medical Services & Specialists | $ 10,500 | $ 1,267,425 | $ 1,277,925 |
| COVID Patient Transportation | $ - | $ - | $ - |
| Dietary supplies | $ - | $ 14,496 | $ 14,496 |
| **Total** | **$ 107,059,587** | **$ 3,792,831** | **$ 110,852,418** |

27. Cedars-Sinai also produced PDF invoices and payment support that correspond to the non-labor cost population. Further, some non-labor related costs are supported by payment registers ("Tri-Ad" support).

28. I combined the details from the non-labor related costs as provided in the ledger extracts into a single electronic database, via Microsoft Excel, at Exhibit C.

## Clean-Up Costs/Extra Expense Verification

29. To ensure the accuracy of the incremental COVID-19 related non-internal labor cost extracts from Cedars-Sinai, I performed several steps. I tied invoice amounts from the extracts back to the PDF invoices or payment details, where available, and confirmed the details. Of the 1,217 invoiced line items included in the COVID-19 related non-internal

labor costs, support for 1,017 was made available for my review. The 1,017 supporting documents I reviewed accounted for $82.9 million out of $95.3 million in total invoiced amounts, or 87.0 % of the total invoiced amounts. In each instance, the documentation provided supported the amount in the extract.

30. I also tied payment registers back to the Tri-Ad extract without exception. The Tri-Ad expenses relate to third party childcare services incurred to ensure staff could attend work. The payment registers support over $16.6 million in funding. My understanding is Cedars-Sinai removed over $1 million of this funding from its incremental COVID-19 costs. The payment registers support funding for the entire $15.6 million incremental Tri-Ad costs.

31. In total, I was able to verify $98.5 million out of $110.9 million, or 88.9% of the total non-labor related Clean-Up costs, without exception. See Exhibit C for full details of the cost verification results.

32. Further, per my discussions with Paul Bouganim, Executive Director of Finance, I understand that Cedars-Sinai's accumulation of incremental COVID-19 related costs, which include the aforementioned non-labor related costs, were subject to third party analysis at several points in time. The Office of Inspector General ("OIG"), independent of Cedars-Sinai and charged with preventing and detecting fraud, waste, and abuse, reviewed and analyzed the costs and did not find any fraud, waste, or abuse. Further, Ernst & Young LLP ("E&Y") is Cedars-Sinai's external auditor. They also sampled, tested, and analyzed Cedars-Sinai's quantification of incremental COVID-19 related costs.

**Proof of Payment**

33. As mentioned above, Cedars-Sinai's financial statements are audited and its internal controls are assessed by the independent accounting firm, E&Y. Cedars-Sinai has

received an unqualified opinion in each Fiscal Year concurrent with the incremental COVID-19 costs incurred and profits lost. Further, I obtained a narrative from Cedars-Sinai describing its purchases and payments process, which I understand, is also provided to its auditors from E&Y.[21]

34. I am relying on Cedar-Sinai's internal controls and accuracy of its financial reporting that costs incurred by Cedar-Sinai, including non-labor related Clean-Up costs, are ultimately paid to the vendor providing the service.

35. However, to further verify that Cedars-Sinai's internal controls are reliable, I selected 10 specific entries from the ledger extracts, including the largest five entries and five randomly selected entries, and requested proof of payment support from Cedars-Sinai. Banking information, such as bank statements, wire payment details, Automated Clearing House ("ACH") details, or check copies/details were requested to verify the payments made by Cedars-Sinai. The 10 selections totaled $7.6 million, and we received supporting documentation from Cedars-Sinai for all 10 entries. After reviewing the documents provided, I concluded that all 10 selections were supported without exception, meaning that the payment support provided tied to the amount contained in the extract and Cedars-Sinai paid the respective vendor.[22] See Exhibit D for complete details on the proof of payment testing.

[21] CSMC – Purchases AP 2022 Narrative.docx

[22] For several samples, the invoice selected was part of a larger payment to a specific vendor. As such, the payment amount either equaled the invoice amount selected or it exceeded the invoice amount selected. In the event the payment amount exceeded the invoice selection, it was not considered an exception.

**Incremental Nature of Clean-Up Costs/Extra Expenses**

36. In my discussions with Cedars-Sinai, many types of the incremental non-internal labor related costs incurred by Cedars-Sinai did not exist prior to the presence of COVID-19 at its facility. This is consistent with my experience preparing policyholder insurance claims related to COVID-19 and other pollution events. Prior to COVID-19, Cedars-Sinai did not incur costs for things like COVID-19-related: screening and safety, test kits, or vaccine supplies. Certain types of costs such as personal protective equipment ("PPE") or cleaning supplies and disinfectant, may have been incurred prior to COVID-19, but at a much smaller scale. The cost extracts from Cedars-Sinai, which were audited by the OIG and E&Y, were prepared to only take into account incremental costs incurred, specifically related to COVID-19.

37. In order to further validate that these costs were incremental, I analyzed the historical FY 2019 non-internal labor related operating expenses (i.e. "Total non-wage expenses" per the profit and loss statements) at CSMC and MRDH and compared them to the non-internal labor related operating expenses post 2019. The charts below graphically depict the pre- and post-2019 non-labor operating expenses at CSMC and MRDH, presenting a before-and-after comparison.

**Charts 1 and 2. Non-Internal Labor Related Operating Expenses**







38. As depicted above, total non-wage expenses from early-mid 2020 through calendar second quarter 2023 were consistently greater than non-wage expenses in calendar 2019 at both locations. I further analyze operating expenses below, within the Business Interruption portion of my report.

**Offsets to Incremental Clean-Up Costs/Extra Expenses**

39. Per instructions from Counsel, AIG and Ironshore are not entitled to offsets for any funds Cedars-Sinai received from the Coronavirus Aid, Relief, and Economic Security

(CARES) Act, Federal Emergency Management Agency (FEMA), or other government agencies. I will further address the concept of offsets later in my report.

***Opinion #1 - Clean-Up Costs and Extra Expenses***

40. **Based on the methodology and analysis described above, it is my opinion that Cedars-Sinai incurred $107,059,587 in incremental Clean-Up Costs and/or Extra Expenses as a result of the spread of COVID-19 throughout its CSMC location. Further, Cedars-Sinai incurred $3,792,831 in incremental Clean-Up Costs and/or Extra Expenses as a result of the spread of COVID-19 throughout its MRDH location.**

**Methodology and Analysis – Business Interruption Losses (Lost Profits)**

41. Business Interruption losses are measured, based on the Policies, by the "Actual Loss" sustained by Cedars-Sinai and its "Extra Expense." Actual Loss is defined in the Policies as the:

> *"1. Net income (net profit or loss before income taxes) the Insured would have earned or incurred had there been no Interruption, and 2. Continuing normal operating expenses incurred, including Ordinary Payroll Expense."*[23]

42. This definition/methodology for determining business interruption losses, in general, is common in my experience. Net income (net profit or loss before income taxes) can be determined by deducting operating expenses (both continuing and non-continuing) from net revenues. The actual loss definition then requires one to evaluate continuing normal operating expenses, including payroll. Another way to look at this, arriving at the same

[23] AIGSpecialty-Cedars000055.

answer, is to determine the net revenues that would have been earned or incurred had there been no interruption, and then deducting any non-continuing (i.e., "saved") expenses to arrive at lost net income.

43. Extra Expense, as noted above, is defined in the Policies as:

*…necessary expenses…the Insured incurs during the Period of Restoration[:] 1. That would not have been incurred if there had not been an Interruption, and 2. That avoid or minimize an Interruption, but only to the extent such expenses reduce Actual Loss…"*[24]

44. Extra Expenses, in my experience, are commonly considered those expenses that are reasonable and necessary expenses that an insured would not have incurred "but for" the event causing the insured loss, to the extent those expenses are above and beyond normal.

45. Measurement of business interruption losses is similar to measuring lost profits from a damages perspective. Lost profits are also generally measured by estimating lost revenues and deducting any saved or avoided expenses.[25] Below, I will describe my methodology and analysis for determining lost net revenues, saved or avoided expenses, and/or Extra Expenses.

**Net Revenues**

46. One of the first steps in the calculation of lost profits (or business interruption losses) is the calculation of lost net revenues. Lost revenues are the monetary amount of sales or other revenues that have not and will not be earned by an impacted party as a result of an event (the event, in this case, being COVID-19). This is often referred to as the amount of revenues the impacted party would have earned "but for" the event, less the actual and

---

[24] Plaintiff Cedars-Sinai Medical Center's First Amended Complaint, page 10. Also, AIGSpecialty-Cedars000056-57.

[25] AICPA & CIMA Forensic & Valuation Services Practice Aid "Calculating Lost Profits" (2020), page 24.

mitigating revenues earned.[26] A common method for estimating but-for revenues is the "before-and-after" method, which generally relies on an entity's prior performance as a basis to project but-for revenues. In other words, but-for an event (in this case COVID-19), the impacted party (in this case, Cedars Sinai) would have experienced the same or similar revenues after the event as it did prior to the event.[27]

47. Other common methods for calculating lost profits include the "yardstick" method, where an expert compares the impacted parties' profits over time to an external or internal entity's performance, and the "sales projection" method, where the expert creates a but-for projection based on historical operations and national, industry, and business economic data. It is often difficult to select an appropriately comparable "yardstick"; also, national, industry level data is not indicative of Cedars-Sinai's unique standing in Southern California and its unique situation in dealing with COVID-19. As such, I utilize the "before-and-after" method to determine "but-for" net revenues.

48. The charts below graphically depict Cedar-Sinai's net patient revenues from January 1, 2019 through June 30, 2023, reported on a quarterly basis. Cedars-Sinai's fiscal year ends each June 30. For clarity, calendar "Q1" in any given year is fiscal "Q3" in any given year. It is my understanding that the loss period applicable to business interruption losses is still at issue in this case. For purposes of my analysis on business interruption losses, I evaluate potential losses from April 1, 2020 through June 30, 2023 ("BI Loss Period").

---

[26] Ibid, page 31.
[27] Ibid, page 36.

**Charts 3 and 4. Net Patient Revenues**







49. The values reflected in the above table are based on the quarterly profit and loss statements (P&Ls) produced by Cedars-Sinai for both the CSMC and the MRDH locations.[28] From January 1, 2019 through December 31, 2019, CSMC averaged $834.3 million in net patient revenues[29] per quarter and totaled $3,337.4 million net patient revenues. MDRH

[28] CEDARS-0002663.
[29] Net patient revenues are assumed to include "PB" or professional billing revenues and Capitation revenues.

averaged $35.5 million in net patient revenues per quarter and totaled $141.8 million net patient revenues.

50. Once COVID-19 began to spread throughout Cedars-Sinai's facilities during calendar Q2 2020, net patient revenues began to severely drop. During the period April 1, 2020 through June 30, 2020, net patient revenues at CSMC totaled $723.8 million, a 13.2% drop from the 2019 quarterly average. During the same period, MDRH net patient revenues dropped to $25.3 million, a 28.6% drop as compared to the 2019 quarterly average.

51. Subsequently, CSMC net patient revenues recovered, as revenues earned during the quarter ending September 30, 2020 returned to pre-loss levels and continued to outpace pre-loss levels through the end of the BI Loss Period. MDRH continued to suffer net patient revenue losses until the quarter ending September 30, 2021, when revenues outpaced pre-loss levels.

52. In order to calculate lost net patient revenues, as previously discussed, I selected the before-and-after method. Because of Cedars-Sinai's standing in Southern California as one its largest acute care hospitals and its standing as one of the largest nonprofit academic medical centers in the United States, I found it reasonable to assume that patients would continue to use its facilities and seek treatments in a consistent manner from one year to the next "but for" the pollution condition (i.e., COVID-19). Further, based on my experience working on business interruption claims for other hospitals and healthcare entities, I found it reasonable to assume that net patient service revenues were not subject to significant macroeconomic changes during the loss period, other than those driven by COVID-19. Based on my experience, hospitals are also not subject to significant seasonality although some may exist. To account for any seasonality, I used the same quarter, pre-loss, to

compare to each loss quarter as opposed to utilizing a full trailing four-quarter average. For example, I compared April through June 2020 net patient revenues to April through June 2019 net patient revenues, as opposed to the average quarterly revenues from January through December 2019.

53. Through June 30, 2020, I've calculated net patient revenue losses of $153.1 million and $12.5 at CSMC and MDRH, respectively. Per Counsel, I've been instructed to assume the pollution condition and thus, BI Loss Period, continued through at least June 30, 2023, as noted above. Through June 30, 2023, I've calculated net patient revenue losses (gains) of $(1,350.5) million and $18.0 million at CSMC and MDRH, respectively. Combined, net patient revenue losses (gains) total $(1,332.5) million. The table below summarizes the net patient revenue losses (gains) I calculated:

**Table 2. Net Patient Revenue Losses (Gains)**

| Quarter | CSMC Net Patient Revenue | | | MDRH Net Patient Revenue | | |
|---|---|---|---|---|---|---|
| | But for Projected Revenue | Actual Revenue | Lost (Gained) Revenue | But for Projected Revenue | Actual Revenue | Lost (Gained) Revenue |
| April - June 2020 | $ 876,837,423 | $ 723,768,220 | $ 153,069,203 | $ 37,797,682 | $ 25,315,245 | $ 12,482,437 |
| July - September 2020 | 827,534,103 | 830,199,545 | (2,665,442) | 32,799,898 | 29,694,083 | 3,105,815 |
| October - December 2020 | 815,836,986 | 860,673,621 | (44,836,635) | 39,752,470 | 32,174,012 | 7,578,458 |
| January - March 2021 | 817,160,925 | 884,222,302 | (67,061,377) | 31,459,381 | 27,864,462 | 3,594,919 |
| April - June 2021 | 876,837,423 | 1,046,218,731 | (169,381,308) | 37,797,682 | 33,635,028 | 4,162,653 |
| July - September 2021 | 827,534,103 | 928,197,608 | (100,663,505) | 32,799,898 | 36,671,969 | (3,872,072) |
| October - December 2021 | 815,836,986 | 950,148,592 | (134,311,606) | 39,752,470 | 35,308,286 | 4,444,184 |
| January - March 2022 | 817,160,925 | 953,534,273 | (136,373,348) | 31,459,381 | 36,691,137 | (5,231,756) |
| April - June 2022 | 876,837,423 | 976,850,204 | (100,012,781) | 37,797,682 | 31,102,179 | 6,695,502 |
| July - September 2022 | 827,534,103 | 981,311,691 | (153,777,588) | 32,799,898 | 37,418,905 | (4,619,007) |
| October - December 2022 | 815,836,986 | 1,027,069,664 | (211,232,679) | 39,752,470 | 40,897,628 | (1,145,159) |
| January - March 2023 | 817,160,925 | 1,032,573,825 | (215,412,900) | 31,459,381 | 36,749,284 | (5,289,903) |
| April - June 2023 | 876,837,423 | 1,044,696,667 | (167,859,244) | 37,797,682 | 41,699,272 | (3,901,590) |
| **Total** | **$ 10,888,945,732** | **$ 12,239,464,942** | **$ (1,350,519,210)** | **$ 463,225,974** | **$ 445,221,491** | **$ 18,004,483** |

## Operating Expenses

54. After establishing changes in net revenues, I analyzed the impacts of COVID-19 on Cedar Sinai's operating expenses in order to determine its net income lost as a result of COVID-19. Part of that evaluation entails determining continuing (i.e., fixed) and non-

continuing expenses (i.e., variable) expenses. Estimating continuing and non-continuing expenses is dependent on case-specific circumstances.[30] Non-continuing expenses are often considered "variable" in a lost profits (i.e., business interruption) scenario, while continuing expenses are considered "fixed." "Fixed" or continuing expenses in a lost profits scenario may differ from those seen in a cost accounting exercise to estimate fixed versus variable costs because fixed costs in a lost profits calculation are those that do not change with the increment of the change between the but-for and the actual scenario (in this case, net patient revenues).[31]

55. In order to evaluate fixed (continuing) and variable (non-continuing) expenses, I performed a case-specific expenses analysis based on the operating expenses at CSMC and MRDH to identify the expense accounts that were considered unaffected by the changes in net patient revenues due to COVID-19 (i.e., fixed) and the expense accounts that were affected by the changes in net patient revenues due to COVID-19 (i.e., variable). Consistent with my process for evaluating lost net patient revenues, I analyzed the expense accounts prior to the loss period and during the loss period. The chart below graphically depicts Cedar-Sinai's operating expenses, split between fixed and variable, during the BI Loss Period and the preceding five quarters.

[30] AICPA & CIMA Forensic & Valuation Services Practice Aid "Calculating Lost Profits" (2020), page 43.
[31] Ibid, page 44.

**Charts 5 and 6. Operating Expenses**







56. As depicted, fixed expenses (not considered to be affected by the fluctuations in net patient services revenue due to COVID-19) remain relatively flat. Variable expenses, conversely, increase during the loss period as compared to pre-loss periods. During 2019, CSMC averaged $613.6 million of variable operating expenses per quarter and totaled

$2,454.4 million of variable operating expenses. MDRH averaged 28.8 million of variable operating expenses per quarter and totaled $115.4 million of variable operating expenses.

57. During the BI Loss Period from April 1, 2020 through June 30, 2023, variable operating expenses at CSMC averaged $762.7 million, a 24.3% increase from the prior 12 month average. During the same period, MDRH variable operating expenses averaged $36.7 million, a 27.4% increase from the prior 12 month average.

58. Per Counsel, I've been instructed to assume the pollution condition and thus, BI Loss Period continued through at least June 30, 2023, as noted above. Through June 30, 2023, I've calculated incremental variable operating expenses of $2,005.8 million and $92.5 million at CSMC and MDRH, respectively. Incremental variable operating expenses total $2,098.3 million. As part of my calculation, I then deducted the incremental Clean-Up Costs/Extra Expenses previously calculated to avoid any potential double-counting or double recovery related to those losses. The table below summarizes the incremental variable operating expenses I calculated:

**Table 3. Incremental Operating Expenses**

| Quarter | CSMC Incremental Variable Operating Expenses | | | MDRH Incremental Variable Operating Expenses | | |
|---|---|---|---|---|---|---|
| | But for Expenses | Actual Expenses | Saved (Extra) Expense | But for Expenses | Actual Expenses | Saved (Extra) Expense |
| April - June 2020 | $ 545,883,119 | $ 648,674,478 | $ (102,791,359) | $ 31,783,616 | $ 30,983,989 | $ 799,627 |
| July - September 2020 | 646,958,128 | 678,642,058 | (31,683,930) | 28,361,686 | 31,568,445 | (3,206,759) |
| October - December 2020 | 658,057,025 | 702,039,880 | (43,982,855) | 29,595,384 | 31,662,072 | (2,066,687) |
| January - March 2021 | 603,474,202 | 719,837,148 | (116,362,946) | 25,639,744 | 35,771,393 | (10,131,649) |
| April - June 2021 | 545,883,119 | 743,925,005 | (198,041,887) | 31,783,616 | 34,395,686 | (2,612,070) |
| July - September 2021 | 646,958,128 | 739,354,635 | (92,396,507) | 28,361,686 | 33,737,876 | (5,376,190) |
| October - December 2021 | 658,057,025 | 765,905,941 | (107,848,915) | 29,595,384 | 37,481,619 | (7,886,235) |
| January - March 2022 | 603,474,202 | 778,938,185 | (175,463,982) | 25,639,744 | 39,645,609 | (14,005,865) |
| April - June 2022 | 545,883,119 | 825,289,415 | (279,406,296) | 31,783,616 | 37,604,912 | (5,821,296) |
| July - September 2022 | 646,958,128 | 797,443,605 | (150,485,478) | 28,361,686 | 38,089,804 | (9,728,117) |
| October - December 2022 | 658,057,025 | 849,287,320 | (191,230,295) | 29,595,384 | 41,413,776 | (11,818,392) |
| January - March 2023 | 603,474,202 | 857,293,526 | (253,819,323) | 25,639,744 | 37,486,801 | (11,847,057) |
| April - June 2023 | 545,883,119 | 808,171,392 | (262,288,273) | 31,783,616 | 40,589,630 | (8,806,014) |
| **Total** | **$7,909,000,541** | **$9,914,802,586** | **$ (2,005,802,046)** | **$ 377,924,908** | **$ 470,431,613** | **$ (92,506,705)** |
| Less: Non-Labor Covid-Related Costs | | | $ 107,059,587 | | | $ 3,792,831 |
| **Total Saved (Extra) Expense** | | | **$ (1,898,742,459)** | | | **$ (88,713,874)** |

**Net Income Lost**

59. The table below provides a summary of the net income losses resulting from my analysis of net patient revenues and operating expenses. Detailed calculations are available at Exhibit E. For the period April 1, 2020 through June 30, 2023, I calculate net income losses of $548.2 million and $106.7 million at CSMC and MDRH, respectively.

**Table 4. Net Income Losses**

| Quarter | CSMC | MDRH | Total |
|---|---|---|---|
| April - June 2020 | $ 255,860,562 | $ 11,682,810 | $ 267,543,372 |
| July - September 2020 | $ 29,018,488 | $ 6,312,574 | $ 35,331,062 |
| October - December 2020 | $ (853,780) | $ 9,645,145 | $ 8,791,365 |
| January - March 2021 | $ 49,301,569 | $ 13,726,568 | $ 63,028,137 |
| April - June 2021 | $ 28,660,578 | $ 6,774,724 | $ 35,435,302 |
| July - September 2021 | $ (8,266,998) | $ 1,504,118 | $ (6,762,879) |
| October - December 2021 | $ (26,462,691) | $ 12,330,419 | $ (14,132,272) |
| January - March 2022 | $ 39,090,634 | $ 8,774,109 | $ 47,864,743 |
| April - June 2022 | $ 179,393,515 | $ 12,516,798 | $ 191,910,314 |
| July - September 2022 | $ (3,292,110) | $ 5,109,110 | $ 1,817,000 |
| October - December 2022 | $ (20,002,383) | $ 10,673,234 | $ (9,329,150) |
| January - March 2023 | $ 38,406,423 | $ 6,557,154 | $ 44,963,577 |
| April - June 2023 | $ 94,429,029 | $ 4,904,424 | $ 99,333,453 |
| **Income Loss** | **$ 655,282,836** | **$ 110,511,187** | **$ 765,794,023** |
| Less: Non-Labor Covid-Related Costs | $ 107,059,587 | $ 3,792,831 | $ 110,852,418 |
| **Total Income Loss** | **$ 548,223,249** | **$ 106,718,356** | **$ 654,941,605** |

60. Counsel has instructed me to assume the net income losses I calculate are reimbursable by Cedars-Sinai's Insurers under the provisions of "Coverage D – Business Interruption Coverage"[32] including "Actual Loss" and "Extra Expense" as previously defined.

[32] AIGSpecialty-Cedars000051-52.

***<u>Opinion #2 – Business Interruption Losses</u>***

61. **Based on the methodology and analysis described above, it is my opinion that Cedars-Sinai incurred $548,223,249 in business interruption losses as a result of the spread of COVID-19 throughout its CSMC location. Further, Cedars-Sinai incurred $106,718,356 in business interruption losses as a result of the spread of COVID-19 throughout its MRDH location**.

**<u>Offsets to Calculated Damages</u>**

62. It is my understanding that CSMC received $27,850,000 for business interruption losses covered by other insurance policies.[33] I have offset my calculation of total losses for this amount (see table below). Per instructions from Counsel, AIG and Ironshore are not entitled to offsets for any funds Cedars-Sinai received from the CARES Act, FEMA, or other government agencies. If they were entitled to those offsets, the net losses I calculate total $482.8 million.

**Table 5. Total Losses Net of Funding**

| Category | CSMC | MDRH | Total |
|---|---|---|---|
| Clean Up Costs | $ 107,059,587 | $ 3,792,831 | $ 110,852,418 |
| BI Losses | $ 548,223,249 | $ 106,718,356 | $ 654,941,605 |
| Less: BI Recoveries | $ (27,850,000) | $ - | $ (27,850,000) |
| **Total Losses** | **$ 627,432,836** | **$ 110,511,187** | **$ 737,944,023** |
| Less: CARES Act Funding | $ (208,925,071) | $ (18,864,335) | $ (227,789,406) |
| Less: Anticipated FEMA Funding | $ (27,313,425) | $ - | $ (27,313,425) |
| **Total Losses Net of Funding** | **$ 391,194,340** | **$ 91,646,852** | **$ 482,841,192** |

[33] Cedars-Sinai Health System Covid-19 Master Summary.pdf.

***<u>Opinion #3 – Damages Suffered by Cedars-Sinai</u>***

63. **As more fully described above, it is my opinion that Cedars-Sinai suffered damages in the amount of $737,944,023 in relation to Clean-Up Costs, Extra Expenses, and Business Interruption losses, including offsets for business interruption proceeds previously paid to Cedars-Sinai. These damages exceed the $100,000,000 of available limits per the Policies**.

64. At the request of Counsel, I analyzed AIG Specialty Insurance Company's 2024 Annual Statement for the year ended December 31, 2024.[34] Net Admitted Assets totaled $135.1 million while Liabilities totaled $75.8 million. Surpluses totaled $59.3 million. The company's ultimate parent is American International Group, Inc. I also analyzed its Combined Annual Statement (including AIG Specialty Insurance Company) for the year ended December 31, 2023.[35] Net Admitted Assets totaled $61.4 billion while Liabilities totaled $42.8 billion. Surpluses totaled $18.6 billion.

65. At the request of Counsel, I also analyzed Ironshore Specialty Insurance Company's 2023 Annual Statement for the year ended December 31, 2023.[36] Net Admitted Assets totaled $704.5 million while Liabilities totaled $413.7 million. Surpluses totaled $290.8 million.

66. I may supplement or amend my opinions prior to or during trial in the event that any new or additional information is discovered, or any court rulings are issued that affect the assumptions in this report.

---

[34] 2024 Annual Statements – SPEC.pdf

[35] aig-combined-annual-statement-2023.pdf. I reserve the right to amend this report if and when the 2024 Annual Statement is available.

[36] 2023 Ironshore Annual Statement.pdf. I reserve the right to amend this report if and when the 2024 Annual Statement is available.

Respectfully Submitted,

Benjamin J. Darrah

Benjamin J. Darrah