# EXHIBIT D

# EXPERT REPORT OF STEPHEN D. PRATER

Attorneys for Cedars-Sinai Medical Center ("Cedars") have requested that I review documents and provide expert opinions in connection with *Cedars-Sinai Medical Center v. AIG Specialty Insurance Company* ("AIG"). The case-specific documents provided for my review by counsel to date in this case are listed in "Exhibit A," attached hereto. My opinions are based in part on my review of case-specific documents provided by counsel and identified above, and my education, background, training, and experience. I have dedicated over 40 years of my professional life to the field of insurance law and practice and am familiar with the standards and practices in the insurance industry.

## I. BACKGROUND

My current Curriculum Vitae is attached hereto as Exhibit "B," which lists my formal degrees and highlights my professional background and experience. My CV references my available publications. Briefly stated:

I am a 1980 cum laude graduate of the University of Santa Clara School of Law, and an attorney admitted to practice in California. I also have a Bachelor of Arts degree (awarded in 1976 with great distinction, Presidents Scholar), and an M.S. degree (awarded in 1978) from San Jose State University.

From 1981 to 1988, I was employed full-time as General Counsel, Vice-President/General Counsel, and ultimately Sr. Vice President and General Counsel for Allied Management Services, Inc. Allied owned and managed several corporations that were actively engaged in the business of insurance. At Allied, we were engaged in the

design, marketing and sales of many different insurance products as well as first party underwriting and insurance claims payment, nationwide.

For 30 years, I was a member of the law faculty (Adjunct Professor, Distinguished Lecturer in Law) at Santa Clara University, School of Law where I taught the only course at the law school on insurance law and practice. I was also an Adjunct Professor at San Jose State University for two years prior to teaching at Santa Clara. (I retired from active teaching in 2013, although I may continue to engage in occasional guest lecturing and supervision of students who are interested in pursuing advanced writing projects in the field of insurance law or practice). Subjects taught in my course included, without limitation, the structure and operation of insurance companies, life and health insurance, property and liability insurance, excess and umbrella coverage, claims handling, industry standards and practices, marketing, underwriting, and alternative delivery systems (HMOs, PPOs, METs and related topics). I served on the executive committee to set up an institute for the advanced study of insurance law and practice at the law school.

I consult on insurance law and practice for insurance companies, insureds, governmental entities, employers and others. The California Department of Insurance, the Federal Government, the State of California, and the City and County of Los Angeles have retained me as an expert. I have dedicated thousands of hours reading, studying and examining documents pertaining to the standards/practices and procedures in the insurance industry generally. I have read and studied the claims handling practices and procedures of more than 35 major insurers, including hundreds of thousands of documents, such as claim manuals, underwriting manuals, policy memos and claim documents, relevant to the business of insurance. My past and present insurance company clients include Farmers Insurance Group, The Hartford Group, CNA, State Farm, Allstate, 20th Century, Guardian Life, Massachusetts Mutual Life, Berkshire Life,

Union Central Life, Blue Cross/Blue Shield, Lloyds of London, Gulf Ins. Co., Ins. Co. of North America, Pacific Indemnity, Standard Life Insurance Company, Transamerica Occidental, Westport, Life Ins. Co. of North America, AIG, MONY, Symetra Life Insurance Co. and many others.

I have been a featured/keynote speaker at more than 200 national, state and local insurance industry sponsored seminars and conventions over the years.

For more than 10 years, I was a Training Officer for Civil Service Employees Ins. Co. (CSE), headquartered in San Francisco, and provided assistance in drafting claims handling standards, claims manuals and other training materials for the claims department. CSE is in the business of writing homeowner's insurance, auto insurance and related products. I had a dedicated phone line for CSE's claims handlers and conducted training seminars for CSE's personnel, as requested.

I provided claims consulting and training services for many years, pursuant to an ongoing consulting agreement, for Massachusetts Mutual in connection with their disability insurance line of business. I provided similar services for Guardian, and Berkshire Life.

From September 1999 through 2004, I was engaged as legal counsel to 20th Century Industries, Inc., which owns, operates and controls several insurance companies that are dedicated primarily to personal lines (automobile and homeowner's) coverage. I was retained to render advice on various insurance issues concerning the day-to-day management and operation of the claims department.

I served as a technical advisor to the National Commission on Accreditation of Benefit Advisors (NCABA), and helped draft NCABA's Rules and Professional Standards. The

NCABA accredited benefit advisors to practice in medical, dental, disability, long-term care, and related areas.

I personally subscribed to and received (often on a daily basis) copies of all statutory and regulatory provisions pertaining to the business of insurance in California, Washington, Oregon, Nevada, Arizona, Idaho, Colorado, and Utah. I also received insurance industry bulletins, regulatory materials, opinions, and other advisory materials. I review similar materials from around the country on an as-needed basis.

I continually review appellate opinions, statutory provisions, regulations, articles and other materials pertaining to the business of insurance, including without limitation, industry claim practices, the implied-in-law covenant of good faith and fair dealing, the duty to defend, rescission, underwriting practices, and the duty to investigate, in connection with my ongoing consulting practice.

I subscribed for many years to leading insurance industry magazines, newspapers and periodicals, including Business Insurance, National Underwriter Publications, and similar weekly and/or monthly publications that discuss all aspects of the insurance industry.

I have been retained many times by insurers, insureds, government agencies, private employers, attorneys and others as an expert on insurance law and practice. I have acted as an arbitrator and mediator. I have testified as an expert at trial in California, Nevada, Washington, Oregon, Colorado, Arizona, Idaho, Utah, Oklahoma, Alaska, Hawaii, Alabama, Florida, Michigan, Minnesota, Kentucky and other states, in both state and federal court. I have given hundreds of depositions as an expert witness and have testified approximately 90 times at trial in the last 40 years. I am frequently retained by insurers and insureds and have always been found to be qualified to testify.

I authored/co-authored a book (the Employee Benefits Guide, a two-volume treatise published by Matthew Bender, New York) and other articles and seminar materials pertinent to the business of insurance. The book provides an extensive overview and study of the laws that regulate employer-sponsored health insurance plans across the nation.

## II. TESTIMONY GIVEN IN THE LAST FOUR YEARS

Exhibit "C" contains a list of cases in which I gave testimony by deposition or at trial since March 2021.

## III. COMPENSATION

I am being compensated for my work in this case at my standard hourly rate of $850 per hour for expert services, and $1,200 per hour for deposition and trial testimony. I also received a $10,000 non-refundable retainer

## IV. MY OPINIONS IN THE PRESENT MATTER.

My opinions are based on my review of the materials presently available and provided for my review, as well as my education, background, training and experience. I will provide several opinions, including:

I have been asked by counsel for Cedars to provide "Tutorial Opinions" to help equalize the knowledge gap that exists between the average ordinary person that sits on a jury, and those engaged in the business of insurance. I have provided such opinions on *hundreds* of occasions - in trial courts, arbitrations and depositions around the country. This is the classic use of an

expert, and my understanding is that the Court will make the legal determinations, and instruct the jury on the law.

My tutorial opinions are set forth in Exhibit "D," attached hereto and incorporated herein by reference. I have utilized this identical outline for decades when addressing customs, standards and practices in the insurance industry. The concepts discussed are well-known and understood by insurance claims handlers and underwriters and are noncontroversial. Nevertheless, they are beyond the understanding of the average person that sits on a jury. This is why I am often asked to provide tutorial opinions. I use the same outline when training claims handlers, lecturing and teaching insurance law and practice.

I have also been asked to discuss generally recognized standards, customs and practices in the insurance industry that apply when adjusting a claim such as the one filed by Cedars.
When considering the customs and practice in California, reasonable experts know the importance of California Insurance Code section 790.03 and the Fair Claims Regulations. These provisions delineate certain *minimum* standards of conduct that must be followed to act fairly and in good faith.

Among other things, these provisions prohibit insurance companies from misrepresenting to a claimant/insured pertinent facts or insurance policy provisions relating to any coverage at issue. They also require insurance companies to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.

Insurance code section 790.03 is known as the "Unfair Claims Practices Act" (UCPA) which was developed by the insurance industry itself. It was originally drafted by the National Association of Insurance Commissioners (NAIC). It has been adopted in virtually every state and has been the law in California for decades. It outlines unfair methods of competition and unfair or deceptive practices in the business of insurance. In order to provide further detailed guidance to insurance companies and their personnel, The Fair Claims Settlement Practices Regulations (10 CCR section 2695.1 et seq.) were created in California, again based on the NAIC model. (Hereinafter referred to as "Regulations")

The Regulations are (or should be) well-known to claims handlers. Annual training is required of all claims handlers and/or their "claims agents," unless exempt. A "claims agent" is defined as, "any person employed or authorized by an insurer to conduct an investigation of a claim on behalf of the insurer…" The term "claims agent" also includes (1) attorneys unless retained by an insurer to defend a claim brought against an insured; or (2) persons hired by an insurer solely to provide valuation as to the subject matter of a claim. In the present case, "claims agent" would likely include the attorneys retained by AIG (and Fortitude Re) who were involved in the investigation of Cedars' claims.

The stated purpose of the Regulations is to delineate *minimum* standards for the handling of claims in California. Policy provisions relating to the investigation, processing and settlement of claims must be *consistent with or more favorable* to the insureds than the provisions set forth in the Regulations. For example, Iolanda Mestre-Gonzales testified that she is familiar with California's Insurance regulations. "We follow them," she said. She also testified that she

received the mandatory annual training. Shelley Panton testified that she was familiar with the Regulations. Many of these Regulations are discussed as a whole or in part in this report.

I have also been asked to review and comment on various letters, documents and events reflected in the claims file (which is supposed to tell the whole story). Many of the claims file documents are heavily redacted, and those that are present are sparse. A claim file in California is required to "contain all documents, notes and work papers (including copies of all correspondence) which reasonably pertain to each claim in such detail that pertinent events and the dates of the events can be reconstructed and the licensee's actions pertaining to the claim can be determined." I question whether the claim file, as produced, is complete.

Some of the letters, documents and events that I considered in reaching my opinions are referenced below. Since discovery is ongoing, I will review additional materials as they are produced by either party and made available to me.

| | |
|---|---|
| **May 27, 2015** | Policy effective date. Commercial Pollution Legal Liability policy expires May 27, 2020. AIG primary policy provides up to $50 million in coverage for each incident and in the aggregate. $50 million Ironshore excess policy is "follow form." |
| **March 18, 2020** | Email from Michelle Dudek to Elaina Charas and Kerry Simon regarding AIG's search for accounts with a known "protect" enhancement. The email states in relevant part that "We do not |

give BI/PD for viruses/bacteria on any of our forms/endorsements," but that "[i]f we do give, it is limited to cleanup costs only (and potentially, resulting business interruption.") The email also notes that "it was very common to offer [extensions for viruses/ bacteria] via endorsement through one of our 'Protect' Endorsements or by manuscript." The email further asks "One point of distinction for the below – were these costs for NYL preventative, or in response to known contamination at the site?" The remainder of document is redacted. *See* AIGSpecialty-Cedars002432.

**Marketing: PLL Wellness Protect**. "[P]rovides a comprehensive insurance solution tailored to the unique environmental pollution risks faced by the healthcare industry. Airborne bacteria and viral diseases." This marketing document notes that "If appropriate disinfection procedures are not carefully followed, airborne infectious agents arising from patients, healthcare personnel and hospital visitors may contaminate such surfaces as medical instruments and devices, floors, walls, and tabletops." The marketing provides a "PLL Wellness Protect" coverage solution: "Clean-Up Costs are now included for bacteria and viruses." *See* Ironshore 00241.

| | |
|---|---|
| **May 18, 2020** | **Formal notification of claim.** Cedars provided broad notice of "Pollution Condition Covid-19." Noted that the Insured has generated cleanup costs, restoration costs, etc. related to Pollution Condition Covid-19. *See* CEDARS-00000908. AIG Claims, Inc. is claims administrator for AIG Specialty Insurance Company which confirmed receipt. |
| **May 21, 2020** | **Supplemental claims handling guidance for Covid-19 property claims.** Reference tool. Claims professionals should always review the full policy language and evaluate based on individual facts. This supplemental guidance is not a substitute for and does not change, alter or modify the AIG general insurance claim handling policy, guidelines or standards. The guidance specifically notes that "Because of the lack of testing for Covid-19 on physical property, we should not require insureds to provide test results [on physical property]to demonstrate evidence of Covid-19 on covered property." Instead, the guidance provides that AIG should ask particular investigation questions." *See* AIGSpecialty-Cedars001987. |
| **June 1, 2020** | Email from Broker Barry Kramer (Chivaroli) to Kristen Schmidt (Ironshore) providing response to questions. "Cedars-Sinai Medical Center has had 476 confirmed inpatient cases of Covid-19 |

| | |
|---|---|
| | as of 5/27/20." Additional confirmed cases are listed, including at other facilities. "Cedars-Sinai has proceeded with protocols at all of its health system ambulatory locations consistent with having multiple confirmed Covid 19 encounters." Confirmed that Cedars has incurred disinfection expenses in response to Ironshore's question "Have you incurred disinfection expenses (expenses related to disinfect) these locations?" Mr. Kramer notes that ongoing expenses are still being incurred, and that primary environmental liability program with AIG may also be available for disinfection expenses. *See* CEDARS-00000880. |
| **July 6, 2020** | Ironshore letter to insured. "Ironshore will refrain from issuing a formal coverage letter until such time that it receives a copy of the coverage position letter issued by AIG," expressly reserving its rights. *See* Ironshore 00015-16. |
| **February 19, 2021** | Broker Barry Kramer (Chivaroli) email to Ossian Cooney (AIG) under the Property Policy. "Thank you for providing us with an advanced courtesy 'draft' of AIG's coverage denial." Mr. Kramer notes that "your letter seems to ignore AIG's history and overall intent of coverage," and then discusses that history, including the fact that an additional premium of $134,675 was charged for communicable disease coverage. *See* CHIVAROLI_00001104. |

| | |
|---|---|
| **April 6, 2021** | AIG (Shelley Panton) to Pamela Hamilton (Cedars-Sinai). ”We previously acknowledged receipt of a May 18, 2020 notice reporting ‘costs incurred as a result of Pollution Condition Covid-19.’ This letter advises that certain terms and conditions of the Policy apply to preclude or limit coverage and reserves ASIC’s rights. . . . No other policies [other than PLC 18946438] were considered. If Cedars-Sinai asserts a potential right to coverage under another policy issued by any other member company of AIG, please submit notice pursuant to the notice conditions contained in that policy.” “ASIC understands Cedars-Sinai seeks coverage under Coverage A,” which ”has limits of $50 million Each Incident . . . subject to a$100,000 Each Incident deductible.” AIG asserts it cannot determine at this time the deductibles that may apply, and that it needs more information. Reservation of rights repeatedly stated. AIG “denies coverage for the costs of the preventative measures that Cedars-Sinai took, on the basis that they do not constitute Clean-Up Costs resulting from a Pollution Condition.” AIG also notes that “the Policy contains Exclusion E, which excludes coverage for Internal Expenses.” Other duties of insured discussed. AIG concludes that it appears there is no coverage, although it continues to reserve its rights, and provides a |

| | |
|---|---|
| | California Department of Insurance denial notice. *See* AIGSpecialty-Cedars000203. |
| **May 5, 2021** | Conversation between Brendan Gray and Shelly Panton:. "f off". *See* AIGSpecialty-Cedars002537. |
| **May 20, 2021** | AIG claims (Ossian Cooney) to Cedars-Sinai (Tejal Patel). Lexington policy Reservation of rights letter. *See* CEDARS-00025750. |
| **September 6, 2022** | Cedars-Sinai partial response to AIG letter and reservation of rights dated April 6, 2021. Notes disagreement with AIG's position regarding the number of pollution conditions, incidents or deductibles. Notes policy definition of "each incident" refers to "the same, related or continuous pollution conditions," such that there is only one incident and only one deductible applies. Contains a response to AIG's partial denial of coverage under coverage A, which provides coverage for viruses, defines Environmental Laws to include Guidance documents, and contains other broad coverage language. Notes that PPE satisfies the definition of "cleanup costs." *See* AIGSpecialty-Cedars002741. |

| | |
|---|---|
| **July 24, 2023** | Latham letter to Matthew Fink. Among other things, seeks confirmation of the possibility of coverage before responding to extensive requests. *See* CEDARS-00140. |
| **November 14, 2023** | AIG's response to Latham. *See* CEDARS-00026466. |

**Claims Handling Process**

The insurance business is heavily regulated to protect consumers from unfair, deceptive and anticompetitive activity in the business of insurance. The UCPA is (or should be) well known and understood by claims handlers. It does not apply to insureds or claimants. It sets forth *minimum* required standards of conduct for those engaged in the business of insurance.

The National Association of Insurance Commissioners (NAIC) developed these model claims handling Regulations and statutes which have been incorporated into the standard and practice in the insurance industry, and in some cases, codified as law. I have testified on hundreds of occasions that insurance companies are required to pay all covered claims that are honestly made at the earliest possible opportunity.

Affirming coverage in this case should have been easy for AIG to do. Instead, they talk about *potential* coverage or possible coverage and then make repeated requests for duplicative and/or unnecessary information, subject to a continuing "reservation of rights". The requests are often nonsensical, unnecessary, burdensome and/or oppressive. Examples include (1) requesting

"information regarding people diagnosed or suspected of having Covid-19 at the properties, or Covid-19 existing on any surfaces" to demonstrate a Pollution Condition ((AIGSpecialty-Cedars000203), but then turning around and declaring "the presence of a virus is not a discharge, dispersal, release, or escape" of a Pollution Condition (AIGSpeciality-Cedars000008); and (2) demanding that Cedars provide "identify which Clean-Up Costs resulted from the presence of individuals who tested positive." (CEDARS-00026466).

Insurance companies that choose to do business in California are required to fully comply with the UCPA and applicable Regulations. Failure to do so is evidence of bad faith. In my opinion, there are violations of the standards set forth in Insurance Code sections 790.03 (h)(1)(2)(3)(4)(5) and (13) in this case and as a general business practice. I expect that at the time of trial I will explain the provisions, where they came from, etc. as I have done in many cases around the country.

The first step in the claims handling process occurs when the insurance company receives "Notice of Claim." "Notice of Claim" means "any written *or oral* notification to an insurer or its agent that reasonably apprises the insurer that the "*Claimant*" wishes to make a claim against the policy or bond issued by the insurer and that a condition giving rise to the insurer's obligations under the policy or bond *may* have arisen." A "*Claimant*" means a first- or third-party claimant. In the present case, Cedars-Sinai Medical Center is a "*first party claimant*" which means "any person asserting a right under an insurance policy as a named insured."

The applicable insurance regulations make it clear that upon notice of claim, the insurance company must immediately (1) acknowledge receipt of the notice, (2) provide to the claimant necessary forms, instructions, and *reasonable assistance*, including but not limited to, specifying the information the claimant must provide for proof of claim; and (3) begin any necessary investigation of the claim. An "*investigation*" means all activities of an insurer or its "claims agent" related to the determination of coverage, liabilities or nature and extent of loss or damage for which benefits are afforded by the insurance policy." "*Claims agent*" means "any person employed or authorized by an insurer to conduct an investigation of a claim on behalf of an insurer". It is also a recognized standard in the insurance industry that "every insurer must conduct and diligently pursue a thorough, fair and objective investigation and **shall not persist in seeking information not reasonably required for or material to the resolution of a claim dispute**." Based on my review of the documents provided, AIG requested information that was not required or material to a resolution of the claim dispute.

**AIG failed to interpret the policy provisions with "Good-Faith Eyeglasses"**

The claims adjuster must first read and interpret the insurance policy at issue fairly and in good faith, to effectuate the reasonable expectations of the insured. While I am not expressing a legal opinion, I would note that under California law, the fundamental goal in interpreting insurance policies is to give effect to the mutual intention of the parties, which is inferred, if possible, solely from the written provisions of the contract, and policy language is interpreted in context, with regard to its intended function in the policy. **Coverage clauses must be given a broad**

**reading, whereas limitations and exclusions are narrowly interpreted against the policy drafter**.

Where a policy provision is susceptible to more than one reasonable interpretation, it should be interpreted consistent with the policyholder's objectively reasonable expectations, and only if doing so fails to resolve the issue will a policy provision be construed against the insurer, as drafter. If the contract language is clear and explicit, it governs. But if it is unclear, since it is the insurer's responsibility to draft the policy in a plain, clear and conspicuous manner, ambiguities are generally interpreted and viewed from the insured's perspective.

Insurance companies must act fairly and in good faith when interpreting insurance policy provisions relating to coverages at issue. AIG didn't appear to give any consideration to Cedars' perspective here. Instead, it focused on ways to unreasonably interpret the policy provisions so as to withhold policy benefits due and continued to drag out the claims handling process under a reservation of rights. AIG must cooperate with the insured and assist the insured in determining the extent of the insured's rights and benefits under the policies at issue. AIG did not offer reasonable assistance here.

When I train claims handlers in California and around the country, or offer my opinions at a trial, I often testify that when reading and interpreting the insurance policy at issue, the claims hander(s) must first put on their ***"Good Faith Eyeglasses*.**" This is because insurance policies are not ordinary contracts. They are contracts of adhesion (with some exceptions), highly

technical in their phraseology, where the insured has to trust that the insurance company will do the right thing if and when a covered claim, or potentially covered claim, arises.

Unlike other commercial enterprises, the business of insurance involves the sale of important promises; one of the most frequently cited cases in the nation dealing with insurance industry standards is *Egan v. Mutual of Omaha* (24 Cal 3d 809). As the California Supreme Court has noted,

> "The insurers' obligations are…rooted in their status as purveyors of a vital service labeled quasi-public in nature. Suppliers of services affected with a public interest must take the public's interest seriously, where necessary placing it before their interest in maximizing gains and limiting disbursements…[A] s a supplier of a public service rather than a manufactured product, the obligations of insurers go beyond meeting reasonable expectations of coverage. The obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of a fiduciary. Insurers hold themselves out as fiduciaries, and with the public's trust must go private responsibility consonant with that trust."

The Supreme Court continues…

> "Furthermore, the relationship of insurer and insured is inherently unbalanced; the adhesive nature of insurance contracts places the insurer in a superior bargaining position. The availability of punitive damages is thus compatible with recognition of

insurers' underlying public obligations and reflects an attempt to restore balance in the contractual relationship."

At the time of trial, insurance policies are interpreted as a matter of law by the court. But when a claim is made, the insurance company claims handlers do not run to court when they have a coverage question. Instead, claims handlers must be thoroughly and properly trained so that they can make timely decisions and reasonably interpret the insurance policy provisions at issue in accordance with applicable law and the minimum claims handling standards discussed in this report.

The **Supplemental Claims Handling Guidance For COVID 19 Property Claims** produced in this case states, "Claim professionals should always review the full policy language and evaluate based on individual facts." (It also references AIG General Insurance Claim Handling Policy, Guidelines, or Standards. Note: There are other manuals and internal documents that I have from other cases, including claims handling guidelines worldwide, but will not discuss them until any confidentiality concerns are resolved).

George Holderied, AIG's designated PMK on underwriting, testified that "AIG utilizes and crafts language that is intended to be unambiguous -- clear and easily understood by the purchaser." He added that the claims handler interprets the policy and applies the definition that is most suitable or relevant and appropriate to the claim scenario at hand. Every claim is unique. Underwriters do not determine if coverages are triggered, he said. "That is exclusively the role of claims."

Christopher Ackerman testified that when he starts a coverage investigation, he first reads the policy in question. Very early on in the claims handling process he noted, "*this appears to be covered and could be a large and ongoing loss. Limits are $50 million.*" He testified that he believed Cedar's claim was *potentially* covered. He was not familiar, however, with how the policy, with its "PLL wellness protect" endorsement, was marketed to potential insureds.

Barry Kramer testified, as the PMK for Chivaroli, that a person from AIG's marketing or underwriting department told us about a new feature in the policy to distinguish it from other insurance companies. That got our attention - the inclusion of bacteria and viruses in the definition of pollution.

**Analysis of claims handling begins at point-of-sale**

When reading and interpreting insurance policy provisions, a claims handler must give full and fair consideration to the marketing of the insurance policy in the first instance. California Courts have long recognized that marketing materials and point-of-sale presentations and/or representations may more accurately reflect the insured's reasonable expectations of coverage than the actual policy itself. Agent or broker representations made, marketing brochures used, and/or other oral or written representations can have the effect of creating coverage at variance with the actual policy provisions. Marketing brochures also give some indication as to what the insurance company believes is covered and may also help explain the words and phrases used in the actual insurance policy itself.

I reviewed a marketing document titled "**PLL Wellness Protect**." This insurance product was designed for healthcare facilities and promises a **Comprehensive Insurance Solution** tailored to the unique environmental pollution risk faced by the healthcare industry. It specifically covers environmental exposures such as ***viral*** diseases – COVID-19, in this case. AIG states that this is a concern for healthcare facilities because "***if appropriate disinfection procedures are not carefully followed, airborne infectious agents arising from patients, healthcare personnel and hospital visitors may contaminate such surfaces as medical instruments and devices, floors, walls and tabletops"***. The "PLL Wellness Protect" coverage solution offered is AIG's promise that "Clean-Up Costs are now included for bacteria and viruses…."

Michelle Dudek testified that this marketing piece was used by AIG underwriters as a hand out to brokers to discuss the potential exposures and policy features. She was likely involved in drafting the document, she said. It is my opinion that this marketing document clearly supports and is consistent with Cedars' coverage positions in this case. I also note that California's Unfair Claims Practices Act section 790.03(h)(1) prohibits an insurance company from misrepresenting pertinent facts or policy provisions relating to coverages at issue.

California Insurance Code section 790.03 (a) strictly prohibits insurers from "making, issuing, circulating, or causing to be made, issued or circulated, any… illustration, circular or statement misrepresenting the terms of any policy issued or to be issued or the benefits for advantages promised thereby." Ms. Dudek sent an email to Elaina Charas and Kerry Simon to confirm, "if we do have coverage in any of our forms, it is limited to cleanup costs only and potentially business

interruption." She testified that viruses and bacteria are not covered in the base form, and that adding coverage for virus protection is commonly done by endorsement as is the case here. She also testified that she was directed to identify all of AIG's products that may include coverage for viruses or bacteria but could not recall why. She did not recall if it was triggered by the COVID-19 epidemic.

It is noteworthy that none of AIG's witnesses who testified at deposition, including the PMK's, could remember any COVID-19 claims that were paid by AIG or any details.

**AIG failed to Affirm Coverage and Continues to Withhold Policy Benefits Due**

AIG unreasonably and without proper cause, failed to *affirm* coverage under insuring agreements **Coverage A - On-site Cleanup of Pollution Conditions**, and **Coverage D – Business Interruption and is therefore wrongfully withholding policy benefits due**. These are ***first party coverages*** and therefore AIG has a fiduciary-like obligation to handle Cedars claims fairly and in good faith. The first step is reading the policy as discussed above. Next, the *insurance company* must immediately commence any necessary investigation. It is the insurer's affirmative nondelegable obligation to conduct a full, fair and thorough investigation, not the insured's. And then the insurer must make a decision - to affirm *or* deny coverage, or send regular status update letters, within the timeframes set forth in the Regulations. There is no 3rd option available to "sit on the fence" and handle a claim perpetually under a reservation of rights. Such a practice would undermine the peace and security of insureds, and their right to receive policy benefits promptly.

**Affirming coverage (or confirming coverage) is one step. Determining the payment amount due is another**. Cedars should not have to wait indefinitely, because AIG is "reserving its rights" to make a coverage decision. The policy plainly and clearly provides for cleanup costs related to the COVID-19 virus, and business interruption expenses as well. But AIG's coverage position continues to morph over time, making it seemingly impossible to collect a penny on this policy.

Cedars' frustration with the seemingly never-ending claims process is reflected in a July 24, 2023 letter from their counsel to AIG stating "Cedars is willing to provide specific instances of the SARS-CoV2 virus's presence on the insured property but requests confirmation of the *possibility* of coverage." Cedars was entitled to more. AIG should have affirmed coverage and cooperated with and assisted Cedars in determining the loss payable. This policy expressly provides coverage for losses caused by viruses. It is unique and not readily available. It was not profitable for AIG, so they stopped selling it.

AIG continues to act unreasonably and withhold policy benefits due, in violation of the continuing duty of good faith and fair dealing. It is my understanding that Cedars has incurred millions of dollars in cleanup costs and expenses, to protect itself and collect benefits that have been wrongfully withheld. Attorney's fees, costs and expenses incurred in order to collect benefits that have been wrongfully is another element of loss or damage here.

AIG has an ongoing obligation to pay the *undisputed amount*, which requires them to investigate timely, gather information, and make reasonably prompt coverage decisions. Insurers are required to maintain reserves which reflect the claims' probable ultimate cost based on the facts known at the time when sufficient information is available. AIG is required to investigate and gather such information. The file reflects that AIG did very little, if anything, to accurately set reserves. It was set at a mere $41 on or about May 20, 2020 and it never changed. It's as if they think the claim has zero value. Instead of doing the right thing, AIG unreasonably and continuously "reserves its rights" to change its coverage opinion *for any reason at any time*, thus undermining the peace of mind and security that should be provided to Cedars but is not evidenced by the claims handling conduct that I have reviewed.

**Extremely Broad Words and Phrases**

The primary insurance policy issued by AIG uses extremely broad words and phrases which favor Cedars coverage position in this case. The excess policy follows form.

**Broad Insuring Promise**: AIG promised to pay on behalf of the Insured (named insured), **Cleanup Costs** (means reasonable and necessary expenses… for the investigation, removal, remediation including associated monitoring, or disposal of soil, surface water, groundwater or *other contamination*) to the extent required by Environmental Laws (means any federal, state, provincial or local laws (*including, but not limited to*, statutes, rules, regulations, ordinances, ***guidance documents*** and governmental, judicial or administrative orders and directives that are applicable to "Pollution Conditions.")). The term "*Pollution Condition*" is included in the

definition section of the base policy but was amended in endorsement number 1 to state, "solely with respect to cleanup costs on or under an insured property, the dispersal, release or escape of ***viruses*** or bacteria, as defined by the Centers for Disease Control, provided such discharge, dispersal, release or escape commences on or after the retroactive date."

The witnesses who were deposed from AIG were, when asked, unable to provide convincing answers to simple questions about the terms and conditions of the insurance policy. Christopher Ackerman would only concede there was "potential" coverage although he testified that he has no experience applying any of the policy terms to a claim arising from COVID-19. "To the extent that cleanup costs as defined by the policy were on or under the property which were related to the virus, there would be coverage," he said.

Michelle Dudek **wrote** an email that stated, "if we do have coverage in any of our forms, it is limited to cleanup costs only and potentially business interruption." She also agreed that virus protection coverage was added to Cedars' policy by endorsement. She was not sure if AIG ever paid any COVID-19 related claim, and when she was questioned during her deposition about the meaning of key undefined terms in the policy, she could not answer. She agreed there were multiple possible definitions for various terms, which is problematic for AIG in my opinion.

Iolanda Mestre-Gonzales testified that "COVID was a new area for us. Prior to 2020 we had not had any claims related to COVID."

Shelley Panton testified that this is the only COVID-19 claim that she handled. She said, "this policy provides coverage for cleanup costs resulting from pollution conditions on the insured property if they are discovered and reported during the policy period." AIG received first notice of the loss on May 18, 2020, and the policy period ended May 27, 2020. She agreed AIG received proper notice of claim.

Ms. Panton also testified that it was her belief that there was "potential coverage" here. Instead of affirming actual coverage, she referred the matter to coverage counsel for further handling. Once coverage counsel took over the handling of the file, there are only 2 pages of claims notes in the following 4 years of claims processing. This is further evidence, contrary to Ms. Panton's testimony, that AIG's outside counsel was acting, at least in part, as AIG's claims handler.

**"Reservation of Rights" letters**

It was unreasonable and below the standard of care in the insurance industry for AIG to utilize a "reservation of rights" letter in this first party case. The duties and responsibilities of an insurance company doing business in California are well-known and understood by reasonable companies, and when a potential claim is submitted, the insurance company must follow the minimum requirements outlined in the Insurance Code and the applicable regulations.

I wrote an unpublished article in July 2003, attached hereto and incorporated herein as "Exhibit E" which explains why a reservation of rights letter is inappropriate in a first party case. AIG uses this approach to attack instead of fairly evaluating claims and an insured can never count on

AIG's position being the final one. It's always a moving target and AIG reserves the right to change their mind *at any time* for any reason. This is unreasonable and below the standard of care in the insurance industry.

I have worked on other cases involving AIG where they issued a reservation of rights letter in a first party case, unreasonably and in bad faith, which is indicative of the general business practice. For example, I'm a designated expert in the pending case of ***San Bernardino County v. The Insurance Company of the State of Pennsylvania*** pending in the United States District Court, Central District of California. Case No. CV 21 – 01978 PSG (AS). I believe portions of the case are subject to a protective order, so I will not discuss the details at this time. It is my hope that counsel can reach an agreement that allows me to testify about the San Bernardino County case in the present matter.

California's Unfair Claims Practices Act defines unfair and deceptive practices in the business of insurance, and section 790.03 (a) of the California Insurance Code enumerates 16 claims settlement practices that, when either knowingly committed on a single occasion, or *performed with such frequency as to indicate a general business practice,* are considered to be unfair claims settlement practices that are prohibited in California. The regulations were promulgated, in part, in order to accomplish certain objectives including delineating certain *minimum* standards for the fair settlement and handling of claims. I believe that the San Bernardino County matter is relevant and demonstrates a general business practice. Some of the records are available through public sources, but I will await further guidance as to when and how I might be able to discuss this matter further. AIG fought hard to keep my opinions on first party/third-party claims as set

forth in above-referenced article away from the jury, arguing that my opinions were contrary to law and unreliable for a lack of support. AIG *never* agreed that it was a first party claim. But the court rejected their arguments and ruled that I can discuss first party principles, because it is a first party claim. (See court's rulings on motions in limine, dated February 27, 2024).

**Additional Opinions**

Some additional opinions that I may offer at trial, if requested by counsel for Cedars include:

1. It is my understanding that AIG refused to affirm or deny coverage in the property claim under Cedar's commercial property policy, and Iolanda Mestre-Gonzalez testified that the claim was resolved for a negotiated settlement. AIG also took inconsistent positions on coverage as it relates to whether or not a virus constitutes a pollution condition. This is further evidence of AIG's general business practice of unreasonably interpreting its policy provisions and using "Reservation of Rights letters" in a first party case to avoid following the standards and the law in California.

2. The business interruption coverage provided under coverage D appears to be triggered and there is no defense available to AIG of late notice. Once again, AIG is unreasonably interpreting its policy provisions to withhold policy benefits due.

3. AIG's Pollution Legal liability Policy with the PLL Wellness Protect endorsement was not profitable for AIG. AIG placed the policy in "runoff" which means a "death spiral" will occur as there is no new premium dollars coming in to support the product. Claims

handlers are often incentivized to look for reasons to deny coverage claims. I would like to review any claims management agreements that exist between AIG and its elected claims handling entities. Profitability is something that underwriting can be concerned about but not people handling claims. At present, it is my understanding that the claim is being handled by Fortitude Re on AIG's behalf.

4. I reviewed the Ironshore policy and it is a "follow form" policy to the AIG policy. It provides Environment Excess liability coverage of $50 million per event and in the aggregate, in excess of the AIG underlying limits of $50 million. I have not reviewed Cedar's billing records, nor do I expect that I will be asked to do so. However, a reasonable excess insurer would anticipate that the total covered costs could exceed the underlying AIG limits, and conduct an independent analysis of coverage. Ironshore did not do that. Instead, Ironshore elected to take a wait-and-see approach and they are following AIG's unreasonable lead. Ironshore elected to take this approach at their own risk and if they had independently followed the claim closely, they would have seen that AIG was acting improperly and below the standard of care in the insurance industry. Finally, Ironshore received timely notice of claim here.
5. As a first party excess insurer, Ironshore is also obligated to act fairly and in good faith. The policy has a provision that says, in essence, if Cedars fails to comply with maintenance of the underlying insurance policy, Ironshore will still be liable, if the covered amount of loss is in excess of $50 million. The limits of the underlying primary policy would be treated more like a large insurance deductible from Cedars' perspective.
6. Julie Wiss was designated as the PMK for Ironshore, and she testified on January 27, 2025 that they agree with AIG's unreasonable coverage position(s). They want to wait for

AIG's final position and evidence of exhaustion and payments made. I will amend this report and add further opinions as I gather additional information relating to Ironshore's involvement, if requested to do so by counsel.

Dated: March 17, 2024

Steven A. Prater

# EXHIBIT A

**Exhibit A**

Documents I reviewed include:

1. Cedars-Sinai's First Amended Complaint, filed on August 27, 2024 (ECF No. 59)
2. AIG's Answer to First Amended Complaint, filed on September 20, 2024 (ECF No. 65)
3. Ironshore's Answer to First Amended Complaint, filed on October 18, 2024 (ECF No. 70)
4. AIG Annual Statement for year ended December 31, 2022
5. Ironshore Annual Statement for year ended December 31, 2022
6. AIG Annual Statement for year ended December 31, 2023
7. Ironshore Annual Statement for year ended December 31, 2023
8. AIG Annual Statement for year ended December 31, 2024
9. AIG Combined Annual Statement for year ended December 31, 2022
10. AIG Combined Annual Statement for year ended December 31, 2023
11. Deposition Transcript of Shelly Ann Panton and exhibits, dated January 15, 2025
12. Deposition Transcript of Tejal Patel and exhibits, dated January 21, 2025
13. Deposition Transcript of Julie Wiss and exhibits, dated January 27, 2025
14. Deposition Transcript of Iolana Mestre-Gonzalez and exhibits, dated January 28, 2025
15. Deposition Transcript of Pamela Hamilton and exhibits, dated January 30, 2025
16. Deposition Transcript of George Holderied and exhibits, dated February 3, 2025
17. Deposition Transcript of Michelle Dudek and exhibits, dated February 19, 2025
18. Deposition Transcript of Christopher Ackerman and exhibits, dated February 24, 2025
19. Deposition Transcript of Barry Kramer and exhibits, dated February 26, 2025
20. Documents produced by AIG in this litigation, Bates numbered AIGSpeciality-Cedars000008, AIGSpecialty-Cedars000025, AIGSpeciality-Cedars000203, AIGSpecialty-Cedars000226, AIGSpeciality-Cedars001986, AIGSpeciality-Cedars002270, AIGSpeciality-Cedars002333, AIGSpeciality-Cedars002431,

AIGSpeciality-Cedars002537, AIGSpeciality-Cedars002556, AIGSpeciality-Cedars002741, AIGSpecialty-Cedars003119, AIGSpecialty-Cedars003508

21. Documents produced by Cedars-Sinai in this litigation, Bates numbered CEDARS-000140, CEDARS-00000559, CEDARS-00000880, CEDARS-00000908, CEDARS-00025750, CEDARS-00026466

22. Documents produced by Chivaroli in this litigation, Bates numbered CHIVAROLI_00001104

23. Documents produced by Ironshore in this litigation, Bates numbered Ironshore 00014, Ironshore 00056, Ironshore 00241

24. All documents cited in my report submitted in this matter.

# EXHIBIT B

**STEPHEN D. PRATER**
Mailing Address:
5567 Morningside Drive
San Jose, California 95138-2227
Telephone: (408) 238-1700

**EDUCATIONAL BACKGROUND**

**JD Degree**, University of Santa Clara, School of Law
Awarded 1980, Cum Laude

**MA Program - Psychology**. University of Santa Clara 21 Units completed. Transferred to Law Degree Program.

**MS Degree - Administration (Criminal Justice)**
San Jose State University, Awarded 1978

**BA Degree - Sociology**, San Jose State University
Awarded 1976 with Great Distinction
President's Scholar

**PROFESSIONAL HIGHLIGHTS**

1981 to 1988

Allied Management Services, Inc., Santa Clara, California
**Sr. Vice President/General Counsel**

Allied Management was a $40 million (sales) holding company with insurance subsidiaries and branch offices throughout the Western States. Position involved corporate management services and General Counsel for all of the companies. In addition to being an officer and director of Allied, also served as officer and director of the subsidiaries, including Commercial & Industrial Administration Co., Inc. (third party insurance administration), Allied Associates Insurance for Commerce & Industry (general insurance brokerage agency).

1983 to 2013

Santa Clara University, School of Law, Santa Clara, California
**Adjunct Professor, Distinguished Lecturer in Law: Insurance Law and Practice**

1980 to 1982

San Jose State University, San Jose, California
**Adjunct Professor**

1982 to Present

Private Insurance Law Practice. Insurance Industry Consultant; Featured Speaker/Lecturer at more than 200 National, State and Local insurance seminars and conventions since 1982. Consultant to Insurance Attorneys. Court-Qualified Insurance Law Expert.

1998 to 2010

**Training Officer** – Civil Service Employees Insurance Company

**PROFESSIONAL AFFILIATIONS**

The State Bar of California

**PUBLICATIONS**

*A History and Anatomy of COBRA* (Calunderwriter Magazine, November 1986); *Practice Under the Employee Retirement Income Security Act* (Bad Faith Law Update, November 1987, Volume 2, Number 4). Co- author of the *Employee Benefits Guide.* This two volume, 2000+ page work was published by Matthew Bender & Company (New York) in October, 1991, and was marketed nationally to insurance company representatives, agents, brokers, plan administrators, employers and attorneys. Publications also include seminar handbooks and materials for distribution to insurance agents, brokers, claims adjusters and others engaged in the business of insurance.

# EXHIBIT C

# Stephen D. Prater Testimony

| Date | Activity | Case | Jurisdiction |
|---|---|---|---|
| Nov 2021 | Deposition | Eskew v. Sierra Health and Life | Las Vegas, NV |
| Jan 2022 | Deposition | Nietupski v. United Healthcare | Phoenix, AZ |
| March 2022 | Trial | Eskew v. Sierra Health and Life | Las Vegas, NV |
| May 2022 | Deposition | Pak v. Berkshire Life Ins. Co. | San Francisco, CA |
| August 2022 | Trial | Shapiro v. CSA et al. | San Diego, CA |
| Nov 2022 | Depo/Arb. | Long Beach L&GP v. Philadelphia | Los Angeles, CA |
| May 2023 | Depo | County of San Bernardino v AIG | San Bernardino, CA |
| June 2023 | Depo | Adams v. National Health | Oklahoma City, OK |
| August 2023 | Depo | Ison v. Berkshire | Letcher Cir. Ct., KY |
| October 2023 | Depo | National Fire & Marine v. USC | Los Angeles, CA |
| Nov 2023 | Arb. | National Fire & Marine v. USC | Los Angeles, CA |
| May 2024 | Arb. | Rucci v. VUMI | Dallas, TX |
| Dec. 2024 | Depo | Mattel v. XL Ins. Co. | Los Angeles, CA |
| Jan 2025 | Depo | Seven Lions v. AIX | Los Angeles, CA |

# EXHIBIT D

# TUTORIAL OPINIONS

**I. The Business of Insurance....**

A. **Insurance companies are in the business of taking risks.**[1]

B. **There is no guarantee – or right, to make a profit.**

C. **Insurance Defined generally as:**

**"**The business of insuring persons or property; coverage by contract whereby one party undertakes to indemnify or guarantee another against loss by a specified contingency or peril."[2]

D. **Insurance companies sell promises in exchange for regular premium payments.**

E. **What insurers sell is security, peace of mind, freedom from financial worry in the event of a catastrophic claim.**

F. **Insureds seek protection against calamity, rather than a commercial advantage.**

G. **The business of insurance is highly specialized, with policyholders particularly vulnerable and dependent on the insurance company.**

**II. Since insurance companies sell important promises greatly affecting the public's interests, they are held to the highest standards of conduct.**[3]

A. **Reasonable Insurers know:**

(1) That the relationship that exists between insurer/insured is inherently unbalanced.

(2) The adhesive nature of insurance contracts places the insurer in a superior bargaining position (The insurer controls the checkbook)

(3) That they must act honestly, and in "good faith"

B. **Certain well-known rules and standards of conduct have developed which insurers know they must follow, including:**

(1) The insurer must treat the insureds interests with equal regard as it does its own interests – this is not an adversarial process.

(2) Part of the claims handlers' job is to assist the insured with the claim.

(3) Insurers must adopt, and implement, reasonable standards for handling claims.

(4) Insurers must act in "good faith" when investigating and evaluating claims.

(5) Failure to fully and fairly investigate a claim does not permit the company to deny the claim due to lack of information.

(6) Insurers must fairly, reasonably, and promptly pay the claim if payment is warranted.

(7) The Company should pay the claim unless there is good reason not to – denial should not be based on speculation.

(8) The Company cannot misrepresent important facts or policy provisions.

(9) The Company must fully comply with the Unfair Claims Practices Act and applicable regulations (training of all claims handlers required) [4]

(10) The claims department is not a profit center.

C. **In order to act in "good faith", insurers also know:**

(1) They can't unreasonably withhold or delay payment of policy benefits due an insured.

(2) They must conduct a full, fair and thorough investigation when notified of a potentially covered claim.

- Proper focus required
- Non-delegable duty

(3) They must evaluate all information received **objectively** and **fairly**

- Can't utilize predictable or biased experts
- Must act reasonably/promptly

(4) Must reasonably interpret the policy provisions (in light of well-known rules of construction)

- Special interpretation standards apply to insurance contracts.

(5) Must fully comply with the state's UFCPA rules (and regs) which represent minimum good faith standards.[5]

(6) Cannot engage in unreasonable litigation conduct.

- The duty of good faith is a continuing duty

D. **If insurers act "unreasonably" (e.g. in "bad faith"), they know that the damages recoverable may include:**

(1) The contract benefits due.

(2) Interest (from the date benefits due)

(3) May include future benefits

(4) Consequential damages

(5) Attorney's fees and costs incurred to collect policy benefits unreasonably withheld.

(6) Punitive damages – if fraud, oppression or malice (and subject to state standards).

# EXHIBIT E

## I. <u>Introduction</u>

A new practice has developed in the insurance industry that directly violates the spirit and the letter of the law. Many insurers are issuing "reservation of rights" letters in connection with the handling of **first party** claims, a technique which enables them to delay payment and to "sit on the fence" when it comes to taking a coverage position. It is my observation and belief that this developing practice is highly improper for several reasons, including:

- First party insurers are required by state law and industry regulations to **promptly** investigate claims, and to **affirm or deny** coverage within stated time frames.

- If an insurer needs more time to investigate or evaluate a claim, there are required procedures that must be followed. There is no acceptable option in the law or the regulations that allows a first-party insurer to avoid making a prompt coverage decision, or delay its investigation, by reserving rights (and then delaying the claim settlement process).

- The issuance of "reservation of rights letters" is appropriate in third-party cases where the insurer is required to make a prompt decision regarding the duty to defend, but needs to reserve rights as to coverage until the facts are known. In first-party cases however, insurers are **required** to investigate and waive nothing by doing so. There is no need to "reserve rights". In fact, first-party insurers have a legal duty to affirm or deny coverage, and if they deny, they must set forth in detail the factual basis for their coverage decision in relation to the applicable law and/or policy provisions. First-party insurance policies also contain prompt payment provisions that must be followed.

These issues, and others, are discussed in greater detail below.

## II. The Development of "Reservation of Rights" Letters

The history, development and use of reservation of rights letters arise in the context of third-party claims. There are hundreds of cases in California that discuss the reservation of rights concept, and virtually all of the cases involve third-party claims. There are a few cases that discuss the issuance of reservation of rights letters in a first-party context, but only in dicta (***Velasquez v. Truck Insurance Exchange***, 1 Cal. App. 4th 712, 1991; ***Tomaselli v. Transamerica Insurance co.,*** 25 Cal, App 4th 1269, 1994; ***Agricultural Insurance Company v. Superior Court of Los Angeles,*** 70 Cal

App 4th, 385, 1999; ***Judah v. State Farm,*** 222 Cal. App. 3d 1133, 1990 (not citable).

The reason reservation of rights letters are used is clear from the case law, and the leading treatises on the subject. (See **Croskey,** California Practice Guide, Insurance Litigation, §7:709). It is a concept that is closely linked to the duty to defend in a liability context, since an insurer who provides a defense without first reserving rights on coverage issues may be deemed to have waived or be estopped to assert coverage defenses at a later time. (***Miller v. Elite Insurance Company***, 100 Cal. App 3d, 739, 1980)

There are also instances where an insurer needs to "reserve its rights" to recoup defense costs paid where it is ultimately determined there is no coverage (***Buss v. Superior Court,*** 16 C, 4th, 35, 1997).

Even in the context of third-party cases where the reservation of rights letter is routinely utilized, the effect of failing to properly and fairly reserve all rights is limited in light of the California Supreme Court's decision in ***Waller v. Truck Insurance Exchange,*** 11 Cal. 4th 1, 1995, which eliminated the automatic waiver rule in the ***McLaughlin*** and ***Intel*** cases. (See ***McLaughlin v. Connecticut General Life Insurance Company***, 565 F. supp. 434; ***Intel v. Hartford,*** 952 F.2d 1551).

Finally, there is an obvious need for "reservation of rights" letters in a third-party setting since the facts and coverage issues often cannot be resolved until the disputed facts are brought out at trial. It should be noted, however, that when an insurer provides a defense under reservation of rights, it is **affirming coverage** for the defense (which is a **first-party benefit**), and it is required to **promptly** affirm or deny the defense – just like any other first-party claim.

**NOTE**: The issuance of a reservation of rights letter in a third-party case often creates a conflict of interest, and triggers "Cumis" counsel, ethical considerations, etc. The quasi-fiduciary relationship that exists in a first-party setting, coupled with a "reservation of rights" *may create similar conflicts/considerations in a first-party case*. This issue and/or the remedy, is not addressed in the case law because the handling of first-party claims under "reservation of rights" is a recent development in the industry, and there are no California cases, statutes, or regulations on point.

## III. <u>The Proper Handling of First-Party Insurance Claims</u>

An insurer's primary duty in the first-party setting is to **pay** all covered claims that are honestly made in a **prompt, fair,** and **equitable** manner. The gravemen of "bad faith" conduct is the insurers' unreasonable withholding or delay in paying policy benefits due. The implied covenant of good faith and fair dealing enjoins the insurer from doing anything to

impair the insured's right to receive policy benefits due. (***Egan v. Mutual of Omaha, (1979)*** 24 C. 3d 809; ***Gruenberg v. Aetna,*** (1973) 9 C.3d 566.) The unreasonable withholding of benefits due may consist of:

- Denial of benefits due;
- Paying less than due (see ***Neal v. Farmers***, (1978) 21 C3d 809); or
- Unreasonable delay in payment, (see ***Waller v. Truck Insurance Exchange***, (1995) 11 C. 4th1, 36, 44) wherein the court states "Delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and **numerous other tactics** may breach the implied covenant because they frustrate the insured's right to receive the benefits of the contract in **prompt** compensation for losses." (NOTE: Waller is a third-party case.)

In order to handle first-party claims fairly and in good faith, California insurers are required to **fully comply** with The Unfair Claims Practices Act, Insurance Code §790.03 (h) (l)-(16), and applicable regulations. These statutory and regulatory standards are well known and non-controversial. They represent **minimum** standards for proper claims handling, and if they are violated, such violation(s) are relevant in determining whether the insurer's conduct was reasonable. (See new BAJI

jury instructions 12.92, 12.93, 12.94 attached as Exhibit A.) **NOTE:** BAJI 12.94 states that violations of Insurance Code § 790.03 are relevant for juries to consider in determining whether the insurers conduct equals "bad faith". **(**There is an apparent error in the instruction. Section 790.03 (h)(12) was inadvertently omitted, and Section (h)(13)-(16) in the act are mis-numbered as (h) (12)-(15) in the BAJI instruction.)

(Insurance Code § 790.03 (h)(1)-(16) is attached as Exhibit B.)

It should also be noted that first-party bad faith disputes often evolve out of an insurer's failure to properly investigate its insured's claim – **promptly, fairly, and thoroughly.** An insurer's duty to investigate is mandated by case law (***Egan v. Mutual of Omaha; McCormick v. Sentinel Life Insurance Company,*** 153 CA3, 1030), statute (Insurance Code § 790.03 (h)(3) and regulation (see Regulation Summary and the Insurance Regulations attached as Exhibit C, D, E and F). An insurer's legal duty to investigate is triggered upon the insurer's receipt of "notice of claim", and the process, allowable time frames to investigate, affirm or deny coverage, pay claims, etc. are proscribed by case law, statute, regulation, and the policy provisions themselves.

## IV. Statutory Considerations in Handling First-Party Claims

Insurance Code § 790.03 (The "Unfair Claims Practices Act") sets forth prohibited practices in the business of insurance – several of which pertain to the proper handling of first-party claims. The national model for the "Unfair Claims Practices Act" was originally drafted by the industry itself – more specifically, by the National Association of Insurance Commissioners (N.A.I.C.). This model legislation has been adopted, wholly or in part, by all states. Many insurance departments have promulgated regulations (based in part on the N.A.I.C. model regulations) that provide detailed time frames in which to respond to communications from insureds, affirm or deny coverage, commence an investigation, etc. In California, insurers must provide training regarding these regulations and any revisions thereto.

With regard to the handling of first-party claims, insurers are required by statute to **affirm or deny** coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured. [§ 790.03 (h)(4)]

If coverage is denied, insurers must promptly provide a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim…[§790.03(h)(13)].

Insurers must also **adopt** and **implement** reasonable standards for the prompt investigation and processing of claims [§790.03(h)(3)], and attempt in good faith to effectuate **prompt**, fair and equitable settlements of claims in which liability becomes reasonably clear (§790.03(h)(5)).

**NOTE:** See new BAJI Jury Instructions, Exhibit A.

## V. Regulatory considerations in handling First-Party claims

The California Insurance Regulations in Title 10 of the California Code of Regulations provide specific standards that must be followed in the handling of first-party claims. There are basically three sets of regulations, with different effective dates. The original claims handling regulations were effective 1-14-93; the revised regulations became effective in May 1997 (Exhibit D); and the new "simplified" version of the regulations became effective yesterday, on 7-23-03 (Exhibit E). There is another "clean-up" amendment that will become effective on 9-3-03(Exhibit F).

In addition to providing copies of the 1997, and 2003 Regulations, I am attaching a summary of the 1993 and 1997 regulations – "At A Glance" (Exhibit C).

As you can see, there are very specific standards that must be followed when handling first-party claims. Noticeably absent is a provision that gives insurers the right to delay making coverage decisions by taking the

position that the first-party claim and/or coverage questions are subject to a "reservation of rights".

Insurers doing business in California must begin any necessary "investigation" **immediately**, but in no event more than 15 calendar days after receipt of "notice of claim". (**NOTE:** All words in quotation marks are defined terms in the regulations.) Upon receipt of "proof of claim" an insurer must **accept or deny** the claim in whole or in part (there is no third option that permits a "reservation of rights"). If additional time is necessary to determine if a claim should be accepted or denied, regular written notice to the insured is required every 30 days until a determination is made. Upon acceptance of a claim, insurers must **immediately**, but in no event more than 30 days thereafter, pay the undisputed amount of the claim. (**NOTE:** For citations to the regulation sections, see Exhibit C, and the actual regulations at Exhibits D, E, and F.)

There is also a very important Insurance bulletin that further clarifies the time constraints for acceptance, denial, and payment of a claim. Formal "Proofs of Loss" or other technicalities are not necessary, and unreasonable insurers that impose "time wasting" requirements can violate any number of regulations (see bulletin 94-10, Exhibit G, and footnotes thereto).

Insurers that conduct time consuming first-party claims investigations or who delay payment under a "reservation of rights" are violating the law. Many insurers also make first-party payments "under reservation of rights", but are not permitted by the policy, or applicable law to do so. When first-party insurers make a decision to pay a claim "with strings attached", it can seriously undermine the security and peace of mind that is essential for insureds.

Finally, violations of the regulations can be considered by juries in deciding whether an insurer acted in bad faith (see ***Rattan v. United Services Automobile Association***, 84 Cal. App 4th, 715, 2000; ***Spray, Gould & Bowers v. Associated International Insurance Company,*** 71 Cal. App. 4th 1260, 1999). It should also be noted that the insurance code, and the regulations, impose **interest obligations** on insurers that do not promptly pay first-party claims. This is true for disability claims (Exhibit H), life claims (Exhibit I), and property claims (Exhibit J).

## VI. Standard Policy Provisions Require Prompt Payment

The standard ISO policy language in first-party property policies requires prompt payment of covered claims within 30-60 days. Disability policies typically require payment immediately, but in the event more than 30 days after the period ends for which the insurer is liable. **Every first-party policy** has written provisions requiring prompt payment within a

specified number of days, and there is no express provision that allows an insurer to delay making coverage decisions by handling the claim under "reservation of rights". Since insurers are allowed to modify standardized forms, each contract must be reviewed to determine the time frames and conditions precedent to coverage. Many insurers will insist they have no obligation to pay until a "proof of loss" acceptable to the insurer has been received, or some other express condition precedent has been satisfied. The Insurance Regulations trump the policy language, which is also subject to the implied covenant of good faith and fair dealing. (Insurers are required to "reasonably" interpret their policy provisions so as to not unreasonably withhold or delay policy benefits due.)

## VII. Conclusion

Insurance companies are required to make coverage decisions **promptly**, and to conduct a thorough investigation if additional information is necessary. The claims adjustment process is not an exact science, and sometimes it is difficult to decide if a first-party claim is payable or not. Nevertheless, it is the insurers responsibility to investigate, **weigh and balance** the information received, and to make prompt coverage decisions within the time frames set forth in the regulations. If, after weighing and balancing all of the information received, it is more likely than not that the claim is payable, the insurer must pay the claim. If, under an all-risk

policy, an insurer cannot establish a loss is excluded, they must pay the claim. Insurers are required to give their insureds **at least** as much consideration as they give themselves (***Egan v. Mutual of Omaha; Gruenberg v. Aetna)***.

It is essential that insurers look for reasons to **pay** covered claims that are honestly made, and that they **fully inquire into possible basis** that might support the insured's claim. (***Egan v. Mutual of Omaha***, ***Downey Savings and Loan v. Ohio Casualty,*** 1987, 189 CA3d 1072). The law is well settled and clear. If a decision is made to **deny** the claim in whole or in part, the insurer must set forth **in detail** the factual and legal basis for the decision. They cannot make up additional reasons as they go along. The Appellate Court in the case of ***Ichthys v. Guarantee Insurance*** (249 Cal. App. 2d 555, 1967) reminds us, "If an insurer denies liability and compels the insured to bring suit, the rights of the parties are fixed as of that time (*e.g. at the time the claim is denied*) for it is assumed that the insurer, in good faith, then has sound reasons based upon the terms of the policy for denying the claim of the insured. To permit the insurer to await the testimony at trial to create a further ground for escape from its contractual obligation is inconsistent with the function the trial normally serves. It is at the trial that the insurer must display, not manufacture, its case." If a first party insurer is allowed to investigate or pay under "reservation of rights", it undermines the duty

to investigate and to make a prompt decision to pay or deny, and set forth the basis for the decision. Why should an insurer make a definitive coverage decision in a timely manner if it can make *qualified* payments, or continue to investigate *ad infinitum*, looking for additional loopholes or ways to escape its obligations?

Simply stated, the use of "reservation of rights" letters in the handling of first-party claims is highly suspect and of limited value. (There may be some cases where an insurer would want to reserve certain rights to preserve their "proof of loss" provisions, or make payments that are highly questionable.) In most cases that I see, however, insurers use reservation of rights letters in order to "sit on the fence", withhold or delay payment, and refuse to make a decision to affirm or deny coverage, which is a violation of the spirit and the letter of the law.

Stephen D. Prater

July 24, 2003