# EXHIBIT F

**In the Matter Of:**

Cedars-Sinai Medical vs AIG

2:24-CV-02543-SRM RAO

**STEPHEN D. PRATER**

*April 21, 2025*

ESQUIRE DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CEDARS-SINAI MEDICAL CENTER, a California nonprofit public benefit corporation,

Plaintiff,

vs.

AIG SPECIALTY INSURANCE COMPANY, an Illinois corporation,

Defendants.

NO. 2:24-CV-02543-SRM RAO

VIDEOCONFERENCE DEPOSITION OF STEPHEN D. PRATER

Date and Time: Monday, April 21, 2025
9:01 a.m. - 3:22 p.m.

Location: Irvine, California
(Remotely)

Reported by: Kimberly Kaldenbach
CSR No. 6719, RMR, CRR

Videographer: Adam Mason

Job Number: J12740603

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CEDARS-SINAI MEDICAL CENTER, a California nonprofit public benefit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>AIG SPECIALTY INSURANCE COMPANY, an Illinois corporation,<br><br>Defendants. | NO. 2:24-CV-02543-SRM RAO |

Deposition of STEPHEN D. PRATER, taken via Zoom videoconference, Orange County, California, commencing at 9:01 a.m., Monday, April 21, 2025, before KIMBERLY KALDENBACH, Certified Shorthand Reporter for the State of California, Certificate Number 6719.

A-P-P-E-A-R-A-N-C-E-S

For Plaintiff Cedars-Sinai:

VORA LAW FIRM, P.C.
BY: JEFF ATTEBERRY, ESQ.
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
(424) 258-5190
Jatteberry@voralaw.com

LATHAM & WATKINS LLP
BY: RACHEL MITCHELL, ESQ.
KIRSTEN C. JACKSON, ESQ.
10250 Constellation Blvd., Ste. 1100
Los Angeles, CA 90067
(424) 653-5500
kirsten.jackson@lw.com
rachel.mitchell@lw.com

For Defendant AIG:

DENTONS US LLP
BY: NATALIE LIMBER, ESQ.
KIMBERLY G.A. DENNIS, ESQ.
JULIA BECKLEY, ESQ.
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017
213 623 9300
natalie.limber@dentons.com
julia.beckley@dentons.com
kimberly.dennis@dentons.com

For Defendant Ironshore:

KAUFMAN BORGEEST & RYAN LLP
BY: BRIAN MARGOLIES (Pro Hac Vice)
200 Summit Lake Drive, 1st Floor
Valhalla, NY 10595
(914) 449-1000
bmargolies@kbrlaw.com

# I N D E X

WITNESS: STEPHEN D. PRATER


| EXAMINATION BY | PAGE |
|---|---|
| Ms. Limber | 6 |
| Mr. Margolies | 196 |
| Ms. Limber | 231 |


## E X H I B I T S


| DEFENDANT'S | PAGE |
|---|---|
| Exhibit 46 - Stephen Prater report | 9 |
| Exhibit 47 - Stephen Prater invoice dated March 17th, 2025 | 65 |


## PREVIOUSLY MARKED EXHIBITS REFERENCED


| | |
|---|---|
| Exhibit 9 - Email from Christopher Ackerman to Tejal Patel dated June 16, 2020 (AIGSpecialty-Cedars002487) | 121 |
| Exhibit 8 - Email from Barry Kramer to Kristen Schmidt dated June 1, 2020 (CEDARS-00000880-00000882) | 122 |
| Exhibit 45 - PLL Wellness Protect brochure (Ironshore 00241-00242) | 135 |
| Exhibit 33 - Undated letter from Ossian Cooney to Tejal Patel (Exhibit E) | 181 |
| Exhibit 25 - May 20, 2021 letter from Ossian Cooney to Tejal Patel (AlGSpecialty-Cedars001159-001180) | 184 |

VIDEO CONFERENCE DEPOSITION - ORANGE COUNTY, CALIFORNIA
MONDAY, APRIL 21, 2025
**** 09:01
THE VIDEOGRAPHER: We are now on the record. The time is 9:01 a.m. Pacific Standard Time on April 21st, 2025. This begins the video conference deposition of Stephen Prater taken in the matter of Cedars-Sinai Medical Center, et al., versus AIG Specialty Insurance Company, et al., filed in the United States District Court, Central District of California, case number of which is 2:24-CV-02543-SRM-RAO. My name is Adam Mason. I am your remote videographer today. The court reporter is Kim Kaldenbach. We are representing Esquire Deposition Solutions. 09:01 09:01 09:01 09:01 09:01 09:01 09:01 09:01 09:02 09:02 09:02 09:02
Will everyone present please identify themselves and state whom you represent, after which the witness will be sworn in. 09:02 09:02 09:02
MS. LIMBER: Natalie Limber from Dentons U.S. on behalf of Defendant, AIG Specialty Insurance Company. 09:02 09:02 09:02
MS. BECKLEY: Julia Beckley joining Natalie Limber also from Dentons for AIG Specialty Insurance Company. Also joined by Kimberly Dennis of our firm. 09:02 09:02
MR. MARGOLIES: Brian Margolies of the law 09:02

firm of Kaufman Borgeest & Ryan. We are counsel for Defendant Ironshore Specialty Insurance Company. 09:02

THE VIDEOGRAPHER: I have background noise.

(Reporter clarification.) 09:03

MR. ATTEBERRY: All right, in any event, this is Jeffrey Atteberry, and I'm with the Plaintiff Cedars-Sinai, and I'm also representing the witness today, Mr. Stephen Prater, and I'm joined by Rachel Mitchell from Latham & Watkins, and I'm with the law firm of the Vora Law Firm. 09:03 09:03 09:03 09:03 09:03 09:03

THE REPORTER: Okay. My name is Kim Kaldenbach, CSR No. 6719. If I can have, Mr. Prater, please raise your right hand.

STEPHEN D. PRATER,
having been first duly sworn,
was examined and testified as follows:

EXAMINATION

09:04

BY MS. LIMBER: 09:04

Q. Good morning, Mr. Prater, how are you today? 09:04

A. I'm good, thank you. How are you? 09:04

Q. I am well, thanks. We have never met, but I understand you have met some of my colleagues in the 09:04 09:04

to your report were you testifying on behalf of the policyholder? 09:55
A. You mean retained on behalf of the policyholder? 09:55
Q. Yes. 09:55
A. Okay. The overwhelming majority. The only one that I think I was retained -- let me see. The Berkshire case/Pak, I was retained by Berkshire. Ison versus Berkshire I was retained by Berkshire. 09:55
Q. Okay. 09:55
A. And that's it. The other ones I was retained by the claimant or the policyholder. 09:55
Q. Was the Vora Law Firm involved in any of these matters? 09:55
A. I don't recall. I don't think so. 09:55
Q. Was the Latham & Watkins firm involved in any of these matters? 09:56
A. I don't remember. I think they may have been involved -- that's guessing, so I don't remember. 09:56
Q. Did any of these cases involve a pollution legal liability policy? 09:56
A. No. The County of San Bernardino versus AIG involved pollution coverage, as you are aware of I'm sure. It wasn't a pollution legal liability policy by name, that I recall. I don't think that was the name 09:56

of the coverage. 09:56
Q. Is that a Covid case? 09:56
A. No, it is not. It is a pollution, contamination, wrongful refusal to pay, bad faith, failure to affirm or deny case. It is a parallel case to this case that we're in here today. It is very similar to the case that we're dealing -- that I'm here today on. 09:56 09:56 09:56 09:57 09:57 09:57
Q. How is that? 09:57
A. Well, I don't know how much I can talk about it. Have you worked out an agreement with counsel so that I can discuss my opinions freely and fully in connection with the parallels that exist between the County of San Bernardino case and this case? Has that been resolved? 09:57 09:57 09:57 09:57 09:57 09:57
Q. I don't believe that has -- I don't believe that has come up, so. 09:57 09:57
A. I talked about it in my report. I said I hoped that the parties would come to an agreement that would allow me to talk freely about the AIG Chino airport case, the County of San Bernardino versus AIG, because there's substantial parallels of evidence of general business practice of violating the Unfair Claims Practices Act and the applicable regulations. 09:57 09:57 09:57 09:57 09:57 09:57 09:57
I think it is important for the jury to see 09:57

point in the claim do you believe that it was easy for AIG to affirm coverage? 10:43

A. Soon after they received notice of the claim. They should have been able to affirm coverage for this loss and these loss-producing circumstances within a period of 30 or 60 days. Within a reasonable period of time they should have affirmed coverage and then told the insured, we're acknowledging that you have coverage for the spread of Covid and the cleanup-related expenses as covered by the policy and potentially business interruption, and now let's work together to find out the amounts that are due. 10:43 10:44

We're going to affirm coverage, is the first step. We're going to tell you you have coverage, give you a green light and then work with you and your experts, if necessary, to come up with the dollar amount owed under the first-party claim. 10:44

I think the code -- I think the regulations give you, I think it may be 40 days to affirm or deny coverage once you are on notice of the claim and then if you are not going to do affirmance or denial of the coverage, you have to send out status update letters and you have to continue to investigate and evaluate and send a status update letter on regular intervals. 10:44

I mean, the California Code of Regulations 10:44

to resolve that coverage question promptly and then told the insured that and took a position on that and then stuck with that position and then worked with the insured to come up with the amount due and pay the undisputed amounts owed at the earliest possible moment. I mean, it should have been handled totally different than the way it has been handled to date. 10:47

Q. The information available to AIG as of -- you said 30 to 60 days, so as of the end of July of 2021 was sufficient for AIG to affirm coverage in your view; is that right? 10:47

MR. ATTEBERRY: Misstates testimony. Go ahead. 10:47

THE WITNESS: Yeah, it is so easy to see the coverage in this case, and it shouldn't have taken long to make that decision, and they could have done it within the time frames prescribed by the regulations and, if not -- if they had a legitimate reason not to be able to affirm coverage, they should have articulated that and then continued to investigate. 10:47 10:48

And, remember, when you have a duty to investigate claims, which AIG has here, you can't put your head in the sand and ignore the facts that are available to you. You know, a reasonable investigation includes, not only that which you know, but that which 10:48

reservation of right technique to try and develop the defenses to the claim as the claim is going on, as opposed to handling it properly in the first instance. 10:49 10:49 10:49

The reservation of rights technique is a bad technique in this kind of claim and it is used to delay payment of policy benefits due and used to give the insurance company what it perceives is latitude to raise additional defenses to cover, even to this day, which is outrageous. 10:49 10:49 10:49 10:49 10:50 10:50

You can't reserve rights in a first-party claim like this, that's outrageous, and they did it in this case, as well as the airport case, and it is their pattern. 10:50 10:50 10:50 10:50

Q. What regulation says that an insurance company cannot issue a reservation of rights in a first-party claim? 10:50 10:50 10:50

A. I don't know that there's a regulation that says that you can't issue a reservation of rights in a first-party claim, but I can tell you that from memory the insurance code section 790.03(h)(4) says that when you receive a first-party claim, you must affirm or deny coverage of the claim within a reasonable period of time. 10:50 10:50 10:50 10:50 10:50 10:50 10:50

If you deny coverage under 790.03(h)(13), you are required to give your basis for the denial that 10:50 10:50

of the presence of Covid patients on the insured property is a -- strike that. 11:11

Do you have an opinion regarding whether it was appropriate for AIG Specialty in its claims investigation to ask about the dates of admitted Covid patients? 11:11

MR. ATTEBERRY: Objection -- I want to get the objection in -- lacks foundation, outside the scope. Go ahead, Steve. 11:11

THE WITNESS: I think that I already answered the question. I think that in a general sense they can ask for and did ask for and did receive information responsive to these questions, and they knew or reasonably should have known other information that was readily available. 11:11

I mean, everybody in the world was on notice of the pandemic and when it started and what the effects were and that it was spread, you know, easily through the air and, you know, I mean, the knowledge developed as time went on but this carrier still has not paid a nickel on this claim and reserves its rights to make up additional reasons why not, which is unreasonable and evidence of bad faith. 11:12

BY MS. LIMBER: 11:12

Q. Are the dates of treatment of the property 11:12

want it back.
I mean, they use their reservation of rights technique to never take an affirmative locked-in position on coverage and they think they can do that with impunity, and I think that's a bad faith practice. 11:26 11:26 11:26 11:26 11:27
BY MS. LIMBER: 11:27
Q. This is a claims made policy, right, not an occurrence policy? 11:27 11:27
A. I don't call it a claims-made or occurrence policy. It is kind of a -- it is a policy that speaks for itself. It is not a traditional claims-made and reported or claims-made policy. It has its requirements set forth in the policy itself. I don't characterize it one way or another. 11:27 11:27 11:27 11:27 11:27 11:27
Q. What are the requirements? 11:27
A. What? 11:27
Q. What are those requirements? 11:27
MR. ATTEBERRY: Objection, lacks foundation, outside the scope. Go ahead. 11:27 11:27
THE WITNESS: They are set forth in the policy itself. 11:27 11:27
BY MS. LIMBER: 11:27
Q. Is one of those requirements a pollution condition discovered during the policy period? 11:27 11:27
A. I don't have the policy memorized. You 11:27

Q. I was afraid. 11:39
A. Yeah. 11:39
Q. When you were wiping down your groceries, did you -- were you doing that because you knew there was Covid on those groceries? 11:39
A. I was recommended to do it as a prevention measure or a cleanup measure or whatever. I mean, you know, it is not an insurance policy that I'm trying to collect under but it was just for my own health and well-being and my family's health and well-being; that the Covid virus was a new phenomena, it was spread through the air. Everybody was scared and society shut down. 11:39
I mean, hospitals were inundated. They set up emergency hospitals outside of their hospitals with tents. I remember seeing that at the hospital here, tents and people being moved into tents. It was like a nightmare, and AIG has the guts to say when somebody buys a policy that specifically covers a virus transmission that you don't have coverage or you can't prove to us that you have coverage? It is outrageous. 11:39
The language of the policy is clear and plain and it provides coverage and at best it is ambiguous, which works in favor of the insured. I mean, the words and phrases used are broad, overbroad, 11:40

it is the same analysis. You put on your good-faith eyeglasses when you review any of the policies and you apply the rules and the interpretation to a pollution policy that you apply to a health policy, that you apply to a disability insurance policy.

So, the standards for reviewing and interpreting a policy are essentially the same for first-party claims no matter what kind of claim it is.

Q. But you said it is a different type of investigation; right?

A. Well, yeah, you are investigating different facts.

Q. Okay. Are there any other ways in which the investigation is different for a pollution claim than for a disability claim or a life claim?

MR. ATTEBERRY: Objection, lacks foundation, outside the scope. Go ahead.

THE WITNESS: Similarities for investigating a first-party claim are more the same than they are different. The nuances and the detail are different, and the amount of information may be -- it depends on the claim and the policy at issue. It depends on the law. It depends on a lot of circumstances.

BY MS. LIMBER:

Q. So, I think I heard you say there are

nuances that are different for pollution claims than for other types of first-party claims; right? 12:45 12:46
A. I think that's fair. 12:46
Q. What nuances? 12:46
A. Well, they are not the same. They are not exactly the same. 12:46 12:46
Q. Every claim should be investigated and handled on its own merits; right? 12:46 12:46
A. Yeah, and you should affirm or deny coverage within a reasonable period of time. You should follow the Unfair Claims Practices Act and the applicable regulations. 12:46 12:46 12:46 12:46
Q. And what is a reasonable amount of time may depend on the specific facts of the claim; right? 12:46 12:46
MR. ATTEBERRY: Objection, misstates testimony, argumentative, outside the scope. Go ahead. 12:46 12:46
THE WITNESS: Yes, sometimes can be affirmed quicker than others and sometimes cannot be quicker than others. 12:46 12:46 12:46
BY MS. LIMBER: 12:46
Q. And that can depend on what information is provided by the insured; right? 12:46 12:46
A. Provided reason -- 12:46
MR. ATTEBERRY: Same objections. Go ahead. 12:46
THE WITNESS: Yeah. 12:46

BY MS. LIMBER: 12:46
Q. Okay. There is another -- you mentioned 12:46
that the investigation of a pollution claim can be 12:47
different. Is there anything else about a pollution 12:47
claim that could be different than other first-party 12:47
claims? 12:47
MR. ATTEBERRY: Objection, vague. Go ahead. 12:47
Outside the scope. 12:47
THE WITNESS: The number of possibilities 12:47
are infinite in terms of how you answer that question. 12:47
It is not capable of being answered precisely, in my 12:47
opinion, because every claim is unique, I'll agree with 12:47
that. Every claim has some unique feature. 12:47
BY MS. LIMBER: 12:47
Q. Are there any other customs and practices in 12:47
the industry as applied to a pollution claim 12:47
specifically? 12:47
MR. ATTEBERRY: Objection, vague, lacks 12:47
foundation, outside the scope. 12:47
THE WITNESS: Yeah, I don't know how to 12:47
answer that question. There's too many possible 12:47
answers to that. You know, every claim is unique, I 12:47
think we can agree on that. 12:47
BY MS. LIMBER: 12:47
Q. So, you mentioned -- you've said that 12:47

Q. The word "virus," is included in the definition of "pollution conditions" in this policy; right? 01:09 01:09
A. Right. And that's not typical at the time. 01:09
Q. Okay. So, what -- what -- other than pointing out that "virus" is included in the definition of "pollution conditions" as respects cleanup costs, what did the brochure help explain? 01:09 01:10 01:10 01:10
A. I think the brochure speaks for itself, and I could read it into the record but I think that would be a waste of time. I think it is one page. It obviously stresses the benefits of buying this product and it covers the circumstances that -- the loss-producing circumstances as I understand it in the present case. 01:10 01:10 01:10 01:10 01:10 01:10 01:10
Cleanup costs are not included for viruses, and it is a warning, you know, if you don't disinfect it carefully, viral diseases, that bad things can happen; you can get sued from third parties, you can have infectious agents harming patients, healthcare personnel, etcetera. I mean, there's a lot of warnings on the bad things that can happen and they say this is the solution to your problems. 01:10 01:10 01:10 01:10 01:10 01:10 01:10 01:10
"Comprehensive insurance solution tailored to the unique environment of pollution risks faced by 01:10 01:11

the healthcare industry." Exactly what they bought this coverage for is exactly why they were entitled to the benefits because the policy is even broader than the brochure in terms of what it covers. 01:11

Q. Is it your testimony that the policy provided bodily injury and property damage liability coverage for viruses? 01:11

MR. ATTEBERRY: Objection, misstates testimony, outside the scope, calls for legal conclusion, lacks foundation. Go ahead. 01:11

THE WITNESS: Yeah, I don't have an opinion on that. I haven't expressed an opinion on that to my knowledge in my report. I have an opinion about a lot of different things, but those aren't at issue in this case, as I understand it, bodily injury or property damage. 01:11

BY MS. LIMBER: 01:11

Q. You referenced a suit by third parties, so that's why I was asking you to clarify. 01:11

A. There is potential coverage for suits by third parties. I know there was some damages reported in that regard, but I haven't been asked to address those in my report or in my opinions. 01:12

Q. Okay. 01:12

A. Or potential coverages. 01:12

Q. Is this the only time you've worked on a matter involving a policy like this that extends coverage to viruses? 01:47

MR. ATTEBERRY: Objection, vague, but go ahead. 01:48

THE WITNESS: I don't recall. It probably is the first time I've seen a policy like this, exactly like this, yes. 01:48

BY MS. LIMBER: 01:48

Q. Okay. So, have you had any other Covid -- have you been involved in any other Covid claims involving a policy like this where the coverage is extended to virus? 01:48

A. Not that I can recall. Most of the other ones I recall looking at were general garden-variety business interruption claims under seasonal policies or excess policies that had pollution exclusions for viruses which made it tough for patients. There was no solution offered to them like there was here to Cedars-Sinai. 01:48

Q. Okay. I would like to turn to your additional opinions starting on page 28. 01:48

A. Yes. 01:49

Q. No. 1, "AIG also" -- I believe we've talked a bit about the first sentence of your Additional 01:49

and Fortitude.
A. Well, AIG Specialty, AIG claims. Anybody that handled a claim on behalf of AIG Specialty, the main insurer.
Q. So, other than those agreements, is there anything else that you would need to see to determine whether there was some incentive to deny this claim?
A. Perhaps their personnel evaluations, if they are produced, personnel files for the claims handling people. Sometimes you find their goals and objectives to reduce or deny payments in those. Sometimes you find them in other documents, but I haven't seen anything to comment on specifically in this case.
Q. Is there anything else pertaining to the runoff of this book of business that would tell you that there was an incentive to deny coverage, other than those agreements that you've mentioned?
A. They may -- the incentives may exist in another form. They may have been given orally. I just don't know. I can't comment on it any further than I've already commented on it in my report.
I'm just raising the possibility, and I suggested that they seek additional documents that may or may not exist, because if you have a TPA handling a claim on your behalf, there has to be a written

agreement and oftentimes in my experience in the past in connection with asbestos claims or other runoff claims, you find that the claims handlers are given an incentive, which is improper or illegal, to deny or underpay claims because they get paid more if they do, so I don't know exactly what exists in connection with this program or this policy, I haven't seen it. 02:16

Q. And I think my question is this: Is there anything inherent to a runoff book or a runoff policy that indicates to you there was an incentive to deny coverage? 02:16 02:17

A. Whenever you have a policy that's discontinued for profitability reasons, there's always -- they can't affect the coverage or the profitability by taking in new premiums because it is a discontinued block of business or policy, so the only way they can affect claims experience in a positive way is to affect the pad of claims, so it creates a built-in incentive. 02:17

You don't have the new claims dollars coming in to offset the losses. So, you know, if you take over a book of business and you do it on a profitability basis, that can be improper. It may not be, it depends on the agreement that exists between the parties, but I haven't seen it, so I don't have 02:17

A. Not necessarily. Some investigations are conducted in private and in secret because they are fraud investigations. 02:49
Q. Okay. Outside of the fraud context, is it -- isn't it standard practice for an insurer to let the insured know that they are undertaking a coverage investigation? 02:49
A. Not necessarily but normally that is done if they are, in fact, doing that. 02:50
Q. Okay. So, is it your opinion then that in the first-party context a primary layer insurer should never issue a reservation of rights letter? 02:50
MR. ATTEBERRY: Objection, misstates testimony, lacks foundation, outside the scope, calls for legal conclusion. Go ahead. 02:50
THE WITNESS: For the first-party claim? 02:50
BY MR. MARGOLIES: 02:50
Q. Uh-huh, yes. 02:50
A. First-party claim a reservation of rights letter is not typically used. It is certainly not permissible in this case or in the airport case that I talked about. If it is permissible at all, it is only under very limited circumstances. I rarely see it and it is not the way that you are supposed to handle a first-party claim. 02:50

STATE OF CALIFORNIA )
) SS.
COUNTY OF ORANGE )

I, Kimberly A. Kaldenbach, a Certified Shorthand Reporter in the State of California, holding Certificate Number 6719, do hereby certify that STEPHEN PRATER, the witness named within the foregoing deposition, was by me duly sworn; that said deposition was taken April 21, 2025, at the time and place set forth on the first page hereof.

That upon the taking of the deposition, the words of the witness were written down by me in stenotype and thereafter transcribed by computer under my supervision; that the foregoing is a true and correct transcript of the testimony given by the witness.

I further certify that I am neither counsel for, nor in any way related to any party to said action, nor in any way interested in the result or outcome thereof.

Dated April 23, 2025, at Orange County, California.

Kim Kaldenbach

Kim Kaldenbach, CSR 6719