# EXHIBIT K

# In the Matter Of:

Cedar-Sinai v AIG Specialty Insurance

2:24-cv-02543-SRM-RAO

## BENJAMIN J. DARRAH

*April 30, 2025*

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CEDARS-SINAI MEDICAL CENTER,
a California nonprofit public
benefit corporation,
Plaintiff,
v. Case No. 2:24-cv-02543-SRM-RAO
AIG SPECIALTY INSURANCE COMPANY,
an Illinois corporation,
Defendant.

VIDEOCONFERENCE DEPOSITION OF
BENJAMIN J. DARRAH
April 30, 2025
8:59 A.M. (CST)

Stenographically Reported by:
Bonnie Pruszynski, RMR, CA CSR No. 13064
Job No. J12740607

April 30, 2025
8:59 A.M. (CST)

VIDEOCONFERENCE DEPOSITION OF BENJAMIN J. DARRAH, before Bonnie Pruszynski, CA Certified Shorthand Reporter No. 13064, a Registered Merit Reporter, Certified Livenote Reporter, and Notary Public of the States of New York and Florida.

APPEARANCES:

Counsel for the Plaintiff, Cedars-Sinai Medical Center:
VORA LAW FIRM, P.C.
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
By: Nilay U. Vora, Esq.
and
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
By: Rachel Mitchell, Esq.

Counsel for Defendant AIG Insurance Company:
DENTONS US LLP
601 South Figueroa Street
Suite 2500
Los Angeles, California 90017
By: Natalie Limber, Esq.
Julia Beckley, Esq.

APPERANCES Continued:

Counsel for Defendant Ironshore Specialty Insurance Co.:
KAUFMAN BORGEEST & RYAN LLP
200 Summit Lake Drive, 1st Floor
Valhalla, NY 10595
By: Brian Margolies, Esq.

Also Present:
Daniel Bennift, Videographer

THE VIDEOGRAPHER: Good morning. We are now on record. Today's date is April 29, 2025, and the time is 8:59. The witness is Mr. Benjamin Darrah. The case number is Cedar Medical Center versus AIG Specialist Insurance Company. The case number is 2:24-cv-02543-SMR-RAO.

Could the attorneys please identify themselves for the record and where they are at.

MS. LIMBER: Natalie Limber on behalf of AIG Specialty Insurance Company, from Dentons US LLP. I'm in New York.

MR. MARGOLIES: Brian Margolies. I am at the law firm of Kaufman Borgeest & Ryan, counsel for Ironshore Specialty Insurance Company. I am also in New York.

MS. BECKLEY: Good morning. This is Julia Beckley with Dentons US LLP, joining Ms. Limber. I'm in Dallas, Texas.

MR. VORA: Is that everybody from defendant?

MS. BECKLEY: Yes.

MR. VORA: Good morning. This is Nilay Vora on behalf of Cedars-Sinai. I am in Santa

Monica, California.

MS. MITCHELL: Good morning. Rachel Mitchell with Latham & Watkins, on behalf of Cedars-Sinai. I am currently in Cincinnati, Ohio.

THE VIDEOGRAPHER: Thank you so much.

My name is Daniel Bennift. I'm your videographer, and I will pass off to our court reporter, Ms. Bonnie.

(Witness sworn.)

BENJAMIN DARRAH,

called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. LIMBER:

Q. Good morning, Mr. Darrah. How are you today?

A. Doing well. How are you?

Q. I am good.

Can you state and spell your name for the record, please?

A. Sure. It's Benjamin Darrah. B-E-N-J-A-M-I-N. Darrah, D-A-R-R-A-H.

Q. Okay. And where are you today?

instruct the witness not to answer that question, on the basis of privilege.

BY MS. LIMBER:

Q. Are you going to following counsel's instruction?

A. I will.

Q. Okay. Paragraph two -- actually, let's go back to paragraph one. I'm sorry. So, you have been retained by Latham & Watkins to calculate financial damages suffered by Cedars-Sinai arising out of an alleged breach of contract and bad faith insurance practices. Do you see that?

A. Yes.

Q. Okay. "I understand that Cedars is seeking reimbursement for business interruption losses, i.e., lost profits, and cleanup costs from its pollution legal liability insurers, AIG Specialty Insurance Company and Ironshore Specialty Insurance Company, collectively the insurers, for damages caused by SARS-CoV-2," which you refer to as COVID-19. Do you see that?

A. Yes.

Q. Okay. You use "lost profits" as a shorthand for business interruption losses. Is

that the -- your understanding of the meaning of business interruption under the AIG Specialty Insurance policy?

MR. VORA: Objection. Lacks foundation. Assumes facts.

Go ahead.

THE WITNESS: I don't have an opinion on the interpretation of the AIG policy, but typically in my experience, business interruption losses are similar to lost profits.

BY MS. LIMBER:

Q. You said similar to lost profits?

A. Yes.

Q. Are there ways in which they are dissimilar from lost profits, "they" being business interruption losses?

A. Not that I can think of right now.

Q. Okay. And you're not interpreting the policy language; correct?

A. Correct.

Q. In paragraph two: "I have not been retained to opine on the merits of the allegations made by Cedars-Sinai in this case." Do you see that?

MR. VORA: Objection. Exceeds the scope.
THE WITNESS: I do not know. I'm not a lawyer, and I did not attempt to interpret the policies.
MS. LIMBER: We've been going for a little bit. Do folks need a break?
MR. VORA: Do you want to go till the hour mark and then take a break maybe?
MS. LIMBER: Yeah, sure, if the witness is good.
THE WITNESS: That works for me.
MS. LIMBER: Okay.
BY MS. LIMBER:
Q. I want to go to actually now the final page of Exhibit B to your report, which is the fees incurred and time spent on this case.
A. I think it was around page 40. Up a couple more.
Q. There we go. Perfect. Thank you.
So, I counted nine folks who are involved in this claim from your office. Is that fair to say?
A. Yes, that's fair to say.
Q. Okay. And that includes yourself?
A. Yes.

cleanup costs and/or extra expenses.
Q. Was that at your direction?
A. Yes.
Q. What did you tell Matt regarding the difference between cleanup costs and extra expenses, if anything?
A. I didn't specify any difference.
Q. What is your understanding of the difference between cleanup costs and extra expenses, if any?
A. Again, I think that's a -- that's a legal question, a coverage question. I don't have an opinion on that.
Q. For purposes of your opinion and your work in this case, have they been -- have you treated them as the same or interchangeable?
MR. VORA: Objection. Vague. Argumentative. Lacks foundation.
Go ahead.
THE WITNESS: I have been instructed to -- to assume that yes, these cleanup costs could fall under either the definition of cleanup -- that these costs could fall under the definition of cleanup costs or extra expenses, yes.

BY MS. LIMBER:
Q. Of the 107 -- well, can I -- is it okay if I use rough numbers today?
A. Yes.
Q. Okay. So, if I say roughly $107 million of incremental cleanup costs and/or extra expenses, we're on the same page that I'm talking about the more specific number?
A. Yes.
Q. Okay. So, of the roughly $107 million there, what amount of that is for cleanup costs versus extra expenses?
A. I don't have an opinion on that.
Q. Of the roughly $107 million, how much of that is for extra expenses versus cleanup costs?
MR. VORA: Asked and answered.
THE WITNESS: I don't have an opinion on that.
BY MS. LIMBER:
Q. And it says, "as a result of the spread of COVID-19." Do you see that?
A. Yes.
Q. What did you mean by "the spread of COVID-19"?
A. Again, I'm not a lawyer. Perhaps I

could have chosen different words, but essentially, that's my way of saying I, you know, relied on counsel for causation and coverage. The spread of COVID-19, as it's phrased there, may have been the way it was phrased in the complaint, in the allegations, but, you know, again, it's -- I'm relying on counsel for coverage and causation.

Q. Okay. So, are you relying on counsel for that characterization of the spread of COVID-19?

MR. VORA: Objection. Vague.

Go ahead.

THE WITNESS: Yes, I -- again, I -- perhaps there's a better choice of words there in my report, but yes, I'm relying on counsel's interpretation of causation and coverage. I'm just putting together the numbers associated with the costs.

BY MS. LIMBER:

Q. Okay. Of the roughly 3.8 million in incremental cleanup costs and/or extra expense as a result of the spread of COVID-19 throughout the MRDH location, how much of that is cleanup costs?

MR. VORA: Objection.

THE WITNESS: I don't have an opinion as

behind those line items that make up the -- this is the summary-level version of it. But yes, those costs that make up these line items would be the population. Yes.

Q. Okay. What did you do to determine what invoices or costs fell into which population item?

MR. VORA: Objection. Vague.

Go ahead.

THE WITNESS: I did not do anything to determine -- to determine which line items fell into which population. Again, I relied on counsel to assume coverage and whether those fit into the definition of cleanup costs and/or extra expenses. I simply looked at the supporting general ledger extract, compared that to the invoices we received to support these amounts.

BY MS. LIMBER:

Q. Okay. So, you have an extract of a general ledger, and you have invoices, and you have this population of costs; right?

A. Yes. The population of costs is from the general ledger extracts. Yes.

Q. Okay. So, how did you know which invoice went to each category of costs?

Q. Okay. Is there anything that you did to verify that the cost was actually for that category of cost?

A. No.

MR. VORA: Objection.

Go ahead.

THE WITNESS: No. We again relied on counsel for -- for coverage and causation. We did not attempt to categorize the costs.

BY MS. LIMBER:

Q. So, if there had been an invoice for Disneyland that was categorized as child care, would you have questioned that?

MR. VORA: Objection. Incomplete hypothetical. Argumentative. Lacks foundation.

Go ahead.

THE WITNESS: If I had come across an invoice from Disneyland, I may have -- I may have asked what it related to.

BY MS. LIMBER:

Q. Okay. Did you ask about any -- was there any instance of any invoice where you asked what it related to or asked for more information to confirm that it related to the cost category in

Misstates prior testimony. Lacks foundation.
Exceeds the scope.
THE WITNESS: Those costs were treated as variable, and the corresponding decrease in other purchased services was also considered variable, so they should offset.
MS. LIMBER: I'm going to move to strike as nonresponsive.
BY MS. LIMBER:
Q. Did you attribute any increase in variable non-continuing expenses between 2019 and 2020 to COVID?
MR. VORA: Objection. Exceeds the scope. Lacks foundation. Vague.
THE WITNESS: I'm not making a -- I have no opinion as to coverage and what's attributable to COVID.
BY MS. LIMBER:
Q. Okay. Did you do any due diligence to determine whether any change in any operating expense was attributed to anything other than COVID?
MR. VORA: Objection. Exceeds the scope. Lacks foundation.
Go ahead.

C E R T I F I C A T E

I, Bonnie Pruszynski, RPR, RMR, do hereby certify that on April 30, 2025. appeared before me, BENJAMIN J. DARRAH.

I further certify that the said witness was first duly sworn to testify to the truth in the cause aforesaid.

I further certify that the signature of the witness to the foregoing deposition was not specified by counsel.

I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st of May , 2025.

Bonnie Pruszynski

Bonnie Pruszynski